In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3357

KEITH HARRIS,

*Plaintiff-Appellant*,

*v.*

DENNIS KUBA and EDWARD MUZZEY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03 238—**David R. Herndon**, *Judge.*

ARGUED DECEMBER 1, 2006—DECIDED MAY 18, 2007

Before EASTERBROOK, *Chief Judge*, and RIPPLE and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* In 1979, a jury convicted Keith Harris of armed robbery and attempted murder, and an Illinois judge sentenced him to fifty years in prison. After spending more than twenty years in prison, then-Governor George Ryan granted Harris a full pardon based on innocence and expunged the conviction on January 10, 2003. Harris claims that he was falsely convicted based on the actions of two police officers, and he sued those officers under 42 U.S.C. § 1983, alleging that they vio-

lated his constitutional right to due process by not turning over three pieces of evidence to the prosecutors before trial and by making false statements to the prosecutor during post-trial motions. The district court granted summary judgment to the officers, Harris appeals, and we affirm.

**I.**

In the early morning hours of December 4, 1978, Mark Resmann was tinkering with his car at the Caseyville Shell Station where he worked. Two men entered the store, one with a rifle and one with a handgun. They demanded money, and Resmann turned over about forty dollars from his pocket. The man with the rifle then directed Resmann to the back office of the store to search for more money. Resmann gave them about $150 from an envelope in the back room. The man with the handgun took the money, while the man with the rifle instructed Resmann to lie down on the floor. The man then took aim with his rifle and shot Resmann about six times. The two men then started to leave, and Resmann tried to get up. The man with the rifle returned to the back room, ordered Resmann to lie down, and shot Resmann again. The pair then departed and somehow Resmann managed to call the police.

Resmann described his assailants to the officer who found him in the back room. Relevant here, he described the individual with the rifle as a dark-skinned black male, 5'10", approximately 25-30 years old, and having a deep voice. He also gave a description of his clothes. Later in the day, he elaborated on the description to an officer at the hospital, stating that the man with the rifle had a thin build, and was 20-30 years old. Officer Dennis Kuba

also came to the hospital and showed Resmann a set of photographs. In the first set, Resmann did not identify any individual as his assailant. A few days later, Officer Kuba returned with additional photographs, and Resmann picked out two photographs of individuals who looked similar to his assailants, but he did not make any identifications from those photographs. Almost a month after the shooting, another officer presented Resmann with a set of photographs, one of which was a photograph of plaintiff Harris. Resmann identified another photograph as the assailant with the pistol, but did not pick out Harris's photograph, or identify any individual as the assailant with the rifle. On February 1, 1979, Resmann went to the police station to view a line-up where each of the participants was required to speak. At the time of the line-up, Harris was eighteen years old, 5'9", and weighed 149 pounds. Resmann identified Harris as the assailant with the rifle.

Harris subsequently faced trial for attempted murder and armed robbery along with Bryan Lawrence. The prosecution relied solely on Resmann's identification of the assailants as evidence of guilt. By the time of trial, police officers had yet to recover the gun, fingerprints, clothing, or other evidence linking Harris to the crime. Harris's defense at trial relied solely on mistaken identity. He argued that he was light-skinned, not dark-skinned as Resmann had originally stated, and that his features became familiar to Resmann because his photograph was shown to Resmann before the line-up, even though Resmann did not initially identify him. Additionally, Harris had a twin brother who testified at trial that he was Harris's twin, a fact defense counsel argued cast doubt on Harris's identity as the perpetrator. Resmann testified at

trial and repeated his identification in court, and explained that he "knew [Harris's] face, and as soon as he turned around, and I recognized the voice, the voice hit me . . . it rang something in my head, just right off the bat." A jury found Harris guilty of armed robbery and attempted murder, and on June 8, 1979, the court sentenced him to fifty years' imprisonment.

The shooting at the Caseyville Shell Station, however, may not have been an isolated crime. Ballistics testing on the bullets recovered from the Shell Station shooting linked the shooting to two other local crimes, a shooting and robbery at the Perfect Circle Donut Shop about an hour before the Shell Station crime, and a robbery and murder at the Mexico City Café about three weeks later. Harris's counsel received this ballistics evidence before trial. A victim of the Mexico City Café shooting had also identified Harris as the assailant from a photograph. Police, however, determined by visiting Harris's employer that he had an alibi for the Mexico City Café shooting because he had been at work during that shooting. This alibi evidence for the Mexico City Café shooting was not given to defense counsel. Harris was never charged in the other two crimes. Another individual, Randolph Chamberlain, supposedly confessed to the Mexico City Café shootings.

Adding a further complication, three other individuals confessed to the Caseyville Shell Station shooting after Harris and Lawrence were convicted. On September 9, 1979, Girvies Davis confessed to committing the crime (in addition to the shootings at the donut shop and café, as well as others) along with Ricky Holman. A few days later, Holman likewise confessed to committing the crime (also in addition to the shootings at the donut shop, café, and others). Davis was able to lead officers to an individual

who had sold the rifle used in the shooting, and the police recovered the weapon. Fred Tiller also admitted to a prison guard that he committed the crime, but when interviewed by police, he terminated the interview. Notably, Harris, Davis, and Tiller were all incarcerated in the same prison and cell block at the same time. Officers Kuba and Muzzey, who were investigating the crimes, theorized that Harris and Lawrence had convinced these others to confess, since the others were already facing multiple murder charges.

Harris was released from prison in 2001, and in 2003 Governor George Ryan ultimately granted Harris a pardon and expungement of his record based on innocence. Harris received $154,000 from the State of Illinois as compensation, but this compensation did not settle any potential claims against Officers Kuba and Muzzey. Harris subsequently brought suit against the officers, claiming that they failed to turn over exculpatory evidence to the prosecutor and made false statements to the prosecutor regarding the case. Specifically, Harris points to three pieces of information that he claims Officer Kuba allegedly should have given to the prosecution, and in turn to defense counsel: (1) the fact that Harris had an alibi for the Mexico City Café shooting, (2) that a victim of the Mexico City Café shooting identified Harris as the perpetrator, and (3) that Chamberlain allegedly confessed to the Mexico City Café shooting. Harris also claims that while his motions for post-trial relief were pending, Officers Kuba and Muzzey told the prosecutors that Harris associated with and knew Davis, knowing this to be false. The district court granted summary judgment to the officers. Harris appeals.

## II.

Harris's claim arises from 42 U.S.C. § 1983, which creates a cause of action against "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Supreme Court has " 'repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability.' " *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986) (internal quotation omitted)). This liability "cannot be founded on negligence." *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006) (citing, *inter alia*, *Daniels v. Williams*, 474 U.S. 327, 330 (1986)). To satisfy section 1983, Harris must demonstrate not only that Officers Kuba or Muzzey violated his constitutional rights, but also that the violation caused Harris injury or damages. *See Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002) (noting that plaintiff must "produce evidence that she sustained actual injury and that her injuries had a causal connection with the alleged due process violation" (citations omitted)).

Harris claims that Officers Kuba and Muzzey violated his constitutional rights under *Brady v. Maryland* and are therefore liable under section 1983. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the right to due process and a fair trial requires that the prosecutor turn over to the defense all potentially exculpatory evidence. That obligation extends to police officers, insofar as they must turn over potentially exculpatory evidence when they turn over investigative files to the

prosecution. *See Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("If officers are not candid with prosecutors, then the prosecutors' decisions—although vital to the causal chain in a but-for sense—are not the important locus of action. Pressure must be brought to bear elsewhere. . . . Requiring culpable officers to pay damages to the victims of their actions, however, holds out promise of both deterring and remediating violations of the Constitution."). In this case, Harris alleges that Officer Kuba is liable under section 1983 for violating *Brady* by failing to turn over evidence to the prosecutor, and that both Officers Kuba and Muzzey are liable under section 1983 for violating *Brady* because they made false statements to the prosecutor.

To establish a *Brady* violation, Harris must show three elements: "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice." *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (citation omitted). Prejudice exists if there is "a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* (citation and internal quotation omitted). A *Brady* violation further requires "materiality" of the evidence withheld, which "in the *Brady* context is the same thing as prejudice." *United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007). This court stated,

> The [Supreme] Court has further explained that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." We have described this inquiry as "materiality," and stated that the demonstra-

tion of materiality is the key to obtaining a new trial where a defendant alleges a *Brady* violation.

*United States v. Baker*, 453 F.3d 419, 422 (7th Cir. 2006) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)) (citation omitted).

Harris first claims that Officer Kuba, who was in charge of the Caseyville Shell Station investigation, failed to turn over three pieces of evidence to the prosecutors, and thus to Harris: (1) Harris's alibi for the Mexico City Café shooting, (2) a victim's identification of Harris as the perpetrator of the Mexico City Café shooting, and (3) Chamberlain's confession to the Mexico City Café shooting. As discussed below, we conclude that this evidence was not suppressed and has limited, if any, favorability. Therefore, there is no *Brady* violation that could support a section 1983 claim. As the evidence does not meet these two requirements, we need not address its prejudice or materiality.

First of all, Harris was not charged in the Mexico City Café shooting and no evidence in the charged Caseyville Shell Station crime was suppressed. Evidence is suppressed "if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and [relevant here] (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *O'Hara*, 301 F.3d at 569 (citation omitted). The fact that Harris had an alibi for the Mexico City Café shooting was "otherwise available" to Harris. *Id.* The file turned over to Harris's counsel contained a ballistics report indicating that the Mexico City Café shooting occurred in December 1978. With minimal research, Harris's attorney could have ascertained the date of the Mexico City Café crime and could have checked

Harris's employment record or inquired of Harris whether he had an alibi on that date. Since Harris knew where he was (and was not) at the time, counsel surely would have done so had Harris been charged in the Mexico City Café incident. But Harris was not charged with that crime, so there was no reason for the government to disclose (what Harris already knew) that he was at his workplace at the time. *See United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) (" 'While the Supreme Court in *Brady* held that the government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case.' " (quoting *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990)). In *United States v. Lee*, 399 F.3d 864 (7th Cir. 2005), we addressed a defendant's claim that the prosecutor violated *Brady* by failing to produce a pair of pants that the defendant had worn and in which a firearm was recovered. In finding this claim to be without merit, we emphasized that "*Brady v. Maryland*, 373 U.S. 83 (1963), deals with the concealment of exculpatory evidence unknown to the defendant." *Lee*, 399 F.3d at 865. Since "Lee was aware of his own pants," the claim was not properly one under *Brady*. *Id.* Harris's own alibi was not concealed from him and is therefore not properly a claim under *Brady*.

Similarly, the defense had evidence that the same weapon was used in the three crimes. Harris's attorney could have sought information about those other crimes to show that Harris did not commit those crimes, and therefore was not guilty of this crime. The evidence of the Mexico City Café victim's identification of Harris and Chamberlain's confession were therefore available to

Harris and his counsel with minimal research or discovery through the exercise of reasonable diligence. *United States v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997) ("[T]he government did not suppress the evidence because the defendants could have obtained it before trial through the exercise of reasonable diligence"). Without demonstrating suppression, there was no *Brady* violation and therefore Harris's section 1983 claim fails.

Furthermore, the pieces of evidence he cites are hardly favorable. To be favorable, evidence must be either exculpatory or impeaching. *Strickler*, 527 U.S. at 281-82. None of the pieces of evidence that Harris points to, when considered at face value, is exculpatory of Harris with respect to the Caseyville Shell Station shooting or impeaches Resmann's identification of Harris. Rather, the evidence is arguably favorable only after several inferences are made. For example, the fact that a victim identified Harris in a photo array as the perpetrator of the Mexico City Café shooting was favorable only to the extent that his workplace alibi kept him from being charged in that incident. The fact that ballistics evidence indicated that the same gun was used at the Mexico City Café and the Caseyville Shell Station does not help Harris. At best, a photograph of him looked like the person who used the same gun at Mexico City Café that later was used at the Caseyville Shell Station where the victim, Resmann, testified that he watched Harris shoot him six times at point-blank range. The facts that Chamberlain confessed to the Mexico City Café shooting and that Harris had an alibi for that shooting are not relevant to the charged Caseyville Shell Station shooting. Those facts do not directly bear on Harris's guilt for the Caseyville Shell Station shooting, and are therefore not exculpatory or

impeaching. Harris tries to connect these pieces of infor-
mation to craft a defense theory, as follows: Harris must
look like Chamberlain, and since Chamberlain confessed
to the related Mexico City Café shooting, Chamberlain
must be guilty of both shootings and Harris must be
innocent of both. This stretches the meaning of "favorable"
beyond that of *Brady*; as noted above, it is not the responsi-
bility of the police or prosecutors to craft a defense theory.
*White*, 970 F.2d at 337. None of these pieces of evidence is
exculpatory for Harris regarding the crime for which he
was charged, the Caseyville Shell Station shooting. Even
in the face of the victim's eye-witness account and identifi-
cation, defense counsel could have crafted this defense
theory from the investigatory file that was turned over; the
ballistics evidence connecting the shootings was disclosed,
and with further research, counsel could have made this
argument. *Brady* does not require that police officers or
prosecutors explore multiple potential inferences to discern
whether evidence that is not favorable to a defendant
could become favorable. *See United States v. Tadros*, 310 F.3d
999, 1005 (7th Cir. 2002) ("This court has held many times
that *Brady* does not require the government to gather
information or conduct an investigation on the defendant's
behalf." (citation omitted)). Such is the work for defense
counsel, not the officers or prosecutors. Since the evidence
Harris points to was neither suppressed by Officer Kuba
nor favorable to Harris's defense, his *Brady* claim must
fail, and we need not reach whether prejudice resulted.

Finally, Harris claims that both Officers Kuba and
Muzzey lied to the prosecutors to preserve the conviction
by telling the prosecutors that Davis and Harris associated
on the street and that this must be the basis for the
false confession. The prosecutors apparently defended the

conviction on this basis. Although Harris characterizes this claim as a *Brady* violation creating section 1983 liability, *Brady* does not apply. Harris essentially seeks an extension of *Brady* to provide relief if a police officer makes a false statement to a prosecutor by arguing that an officer is "suppressing" evidence of the truth by making the false statement. This court has already foreclosed this extension. As we stated in *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006) (citation omitted):

> Nor can *Brady* serve as the basis of a cause of action against the officers for failing to disclose these circum-stances [a coerced confession] to the prosecutor. . . . The Constitution does not require that police testify truthfully; rather "the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies."

Furthermore, in *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) (internal citations omitted) *overruled in part on other grounds by Wallace v. City of Chicago*, 440 F.3d 421, 423 (7th Cir. 2006), we noted that:

> We find the proposed extension of *Brady* [to require the police to render truthful records of interrogations to the prosecutors] difficult even to understand. It implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence. Indeed the duty to disclose falls out, because Gauger knew what he had said at the interrogation. The problem was not that evidence useful to him was being concealed; the problem was that the detectives were giving false evidence. Gauger wants to make every false statement by a prosecution witness the basis for a civil rights suit, on the theory that by failing to correct the state-

ment the prosecution deprived the defendant of *Brady* material, that is, the correction itself.

Like Gauger, Harris knew about his relationship, or lack thereof, with Davis. He was fully capable of challenging the officers' and prosecutors' contention to the contrary. Accordingly, Harris's theory does not constitute a viable claim under *Brady*, the only form of constitutional claim he propounds, and therefore his section 1983 claim is without merit.

## III.

Because the evidence pointed to by Harris was neither favorable nor suppressed, and because there is no relief available under *Brady* for an officer's false statement, Harris is not entitled to relief and we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

 

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*