In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 07-2598

RAUL CARVAJAL,

*Plaintiff-Appellee*,

*v.*

LOUIS DOMINGUEZ, JR., in his individual capacity,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 2958—**James F. Holderman**, *Chief Judge.*

_____

ARGUED APRIL 8, 2008—DECIDED SEPTEMBER 5, 2008

_____

Before KANNE, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* The plaintiff/appellee, Raul Carvajal, was prosecuted in the Southern District of Florida for money laundering and was acquitted at the conclusion of a jury trial. He then brought this civil suit in the Northern District of Illinois against defendant/appellant Drug Enforcement Administration ("DEA") Task Force Officer Louis Dominguez, Jr. for damages, alleging violations of his constitutional rights in connec-

tion with the criminal prosecution. The Illinois district court granted Dominguez's motion for summary judgment in part by dismissing several counts of Carvajal's amended complaint, but the court denied the motion with respect to a count which asserted a *Bivens* cause of action alleging a *Brady* violation. That decision also included a denial of qualified immunity for Dominguez. This appeal followed.

## I. Background

The relevant facts revolve around Officer Dominguez's identification of Carvajal in two undercover money pickups in Chicago. Chicago DEA Task Force Officer Wayne Hunter was assisting in an investigation (called "Operation Double Trouble") of a Miami-based money laundering operation in early April 2001. DEA Miami asked for assistance in arranging two undercover money pickups in Chicago. DEA Miami provided Hunter with a cell phone number and a code to be used to arrange the pickups. The first pickup was to occur on April 16, 2001. Hunter asked agent Dominguez to do the job. Dominguez used the cell number to arrange to meet two individuals; he later identified them as German Matos Ruiz and Raul Carvajal. Dominguez met with the men for about five minutes in the midafternoon inside a Coconuts music store, and he saw them in the parking lot where he spoke with the man identified as Ruiz for a few minutes and observed the man identified as Carvajal sitting in a vehicle. A second transaction took place on April 21, 2001. Dominguez again identified the men as Ruiz and Carvajal;

a woman was also with them. This meeting took place in a Baker's Square restaurant. The meeting lasted about 15 minutes. During the meeting Dominguez initially sat next to the man identified as Carvajal with the man identified as Ruiz across the table; later the men switched, putting the supposed Carvajal across the table from Dominguez. This meeting also occurred in the midafternoon.

It is unclear just when Hunter learned of Carvajal's name in connection with the money laundering investigation—he testified in a deposition in this civil action that he may have gotten the name from DEA Miami or from a Chicago field office intelligence analyst who traced the cell number to Carvajal's ex-wife. Either way, on April 9, 2001, an intelligence analyst in Chicago requested a photo of Carvajal from the Illinois Secretary of State. Hunter did not remember when he got the photo or whether he had it before April 16, the date of the first undercover pickup. Hunter said he knew Carvajal's name by April 15th and may have had the picture by the 16th.

Dominguez said that he did not see Carvajal's photo or have his name prior to the April 16th meeting. Dominguez claims that he first saw Carvajal's photo sometime between the first meeting on April 16 and May 14, 2001, the date of his written reports. He cannot recall whether he saw another photo at the same time he saw Carvajal's or not. He never saw a formal lineup. Hunter testified that he "possibly gave Carvajal's name and photographic image to Dominguez prior to the April 16, 2001, operation to make sure that Dominguez had all the information about

the case and that Dominguez was not meeting with someone he already knew." It is agreed that Hunter would have provided whatever information he had to Dominguez, including the photo—doing so would have been his "normal practice."

A federal grand jury in Miami indicted Carvajal and 33 others in connection with a money laundering scheme; in a superceding indictment he was charged only with acting as a courier. Carvajal filed a motion to suppress Dominguez's identification of him as unduly suggestive in light of the "one-photo procedure used." The judge denied the motion after an evidentiary hearing at which Dominguez and another law enforcement officer (not Hunter) testified. The judge began his ruling with the assumption that the photo identification procedure used by Dominguez was unduly suggestive, but he found that "regardless of whether the procedure used was impermissibly suggestive, there was not a substantial likelihood of misidentification." He noted that Dominguez had an "excellent opportunity to view Carvajal at the time of the two money pick ups" and that there was no evidence that he was "pressured to select Carvajal's photograph." That judge also made a finding that during a separate undercover money pickup (in which Dominguez was not involved), a vehicle was seen that was registered to Carvajal's ex-wife. Later, in a trial with one co-defendant, who was found guilty, a jury acquitted Carvajal.

This brings us to the instant case in which Carvajal brought this civil suit in the Northern District of Illinois

for damages against Dominguez. The district court granted Dominguez's motion for summary judgment on Count One, a claim for false arrest and unlawful search and seizure, and Count Two, a claim alleging a "deprivation of liberty." The court also granted the motion with respect to Count Four—a claim for perjury—noting police witnesses are entitled to absolute immunity from perjury claims for trials and pretrial proceedings and found no evidence supporting an application of the "complaining witness" exception to this rule. Count Three claimed that Dominguez withheld favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The amended complaint alleged that he "knowingly and falsely identified Carvajal as the perpetrator in a money laundering conspiracy and wrote false police reports about him." The district court denied Dominguez's motion for summary judgment with respect to this claim. In its decision, the court rejected the notion that an acquitted defendant, such as Carvajal, cannot have a *Brady* claim but noted that the question is an open one in this circuit and that the district court is split on the question. The court concluded that an acquittal "alone does not show that the police officers complied with *Brady* or that the defendant's trial was fair" and applied the *Brady* analysis "on a prospective basis."[1] Analyzing under

---

[1] The following, from *Carroccia v. Anderson*, another case from the Northern District of Illinois, explains the rationale behind this "prospective test":

> *Brady* and its progeny impose a duty on prosecutors and police officers to produce evidence favorable to the accused
>
> (continued...)

*Brady*, the judge explained: "Carvajal identified as exculpatory Dominguez's alleged failure to tell the prosecutor that he was given Carvajal's name and photographic image before the first transaction on April 16, 2001." "This evidence would have impeached Dominguez's testimony at trial that he did not know Carvajal's name or see his photograph until after the April 16, 2001 transaction and undermined the credibility of Dominguez's post-April 16, 2001 identification of Carvajal." According to the district court, this was "material" because it "would have changed the outcome of the suppression hearing, and the withholding of evidence denied him a fair trial." The court also concluded that Dominguez was not entitled to qualified immunity explaining that "the boundaries of *Brady* as applied to this case have long been established."

---

[1] (...continued)

> where the evidence is material either to guilt or punishment. To discharge this duty, law enforcement officials must make prospective judgments regarding the materiality of exculpatory evidence that comes to their attention. They must decide in advance of trial, and without knowing how the trial will come out, whether evidence favorable to the accused has a "reasonable probability" of affecting the outcome of the case. If courts prohibit a criminal defendant from making a civil claim for concealment of material exculpatory evidence simply because his trial resulted in an acquittal, we tolerate law enforcement misconduct simply because the defendant was able to overcome it by other means.

*Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1023 (N.D. Ill. 2003) (internal citations omitted).

Dominguez now appeals.

## II. Discussion & Analysis

This case comes to us from a *denial* of summary judg-ment—typically a case in such a posture is not immedi-ately appealable to our court. We have jurisdiction, how-ever, under 28 U.S.C. § 1291 and the "collateral order" doctrine. An appeal of an order denying qualified immu-nity is a well-established application of this doctrine: "A district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law is an appealable final decision within the meaning of 18 U.S.C. § 1291, notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

The Supreme Court recently clarified that the scope of this doctrine includes jurisdiction over whether "to devise a new *Bivens* damages action" and explained:

> We recognized just last Term that the definition of an element of the asserted cause of action was "directly implicated by the defense of qualified immunity and properly before us on interlocutory appeal." *Hartman v. Moore*, 547 U.S. 250, 257 n.5 (2006). Because the same reasoning applies to the recognition of the entire cause of action, the Court of Appeals had juris-diction of this issue, as do we.

*Wilkie v. Robbins*, 127 S. Ct. 2588, 2597 & n.4 (2007). Thus, we have jurisdiction over the questions presented by this appeal. Our review is de novo. *See Wernsing v. Thompson*, 423 F.3d 732, 741 (7th Cir. 2005); *Wade v. Hopper*, 993 F.2d 1246, 1251 (7th Cir. 1993).

Determining whether a defendant law enforcement officer is entitled to qualified immunity involves a two-step analysis. The first step is whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a constitutional violation. If not, the inquiry ends, and the officer has qualified immunity. If yes, then the second step is whether the violated right was clearly established. This is determined by looking at whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation. *E.g.*, *Michael C. v. Gresbach*, 526 F.3d 1008, 1012 (7th Cir. 2008). We begin with the first prong and address whether the facts alleged show a constitutional violation.

The constitutional violation alleged in this case was a violation of due process for failure to turn over exculpatory/impeaching evidence to the defendant as constitutionally required—a so-called *Brady* violation. *Brady v. Maryland*, 373 U.S. 83 (1963). While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation. *See Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) ("[A] *Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor . . . .'" (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995))); *Strickler v. Green*, 527 U.S. 263, 280-81 (1999); *Steidl v. Fermon*, 494 F.3d 623, 628, 630-32 (7th Cir. 2007). A *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either

being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, "materiality." *See Youngblood*, 547 U.S. at 869-70; *United States v. Bland*, 517 F.3d 930, 934 (7th Cir. 2008); *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005). Evidence is "suppressed" when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Ienco*, 429 F.3d at 683. Evidence is "material" "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280 (internal quotations omitted); *see also Bland*, 517 F.3d at 934.

Specifically, Carvajal alleges that Dominguez failed to disclose that he had Carvajal's name and saw his photograph prior to the first undercover drug pickup on April 16th. Dominguez's version of the events is that he did not see Carvajal's photograph until sometime after the first undercover pickup. Hunter's deposition testimony, on the other hand, suggests that perhaps Dominguez had the photo earlier, prior to the first pickup. This can be inferred from the April 9th request to the Illinois Secretary of State for a photograph of Carvajal and Hunter's deposition testimony in the civil case that he was "sure" he would have a picture back from the Illinois Secretary of State within a week. Hunter and Dominguez also explained that, per the usual practice, if Hunter indeed had the photograph of Carvajal before the April

16th undercover pickup he would have shown it to Dominguez. Carvajal claims that this fact would have been used to impeach Dominguez and would have changed the outcome of the suppression hearing and that perhaps Carvajal would not even have been subjected to a trial. We simply cannot agree, however, that this amounts to a *Brady* violation.

At the most (as we must assume from the conflicting recollections of when the photo may have been viewed), the facts could support an inference that Dominguez did see the photo before the first pickup and that he lied about when he saw the photograph. But a lying witness is certainly not a *Brady* violation. It is already established law that *Brady* does not extend so far as to provide relief in a situation where "a police officer makes a false statement to a prosecutor." *Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007) ("Harris essentially seeks an extension of *Brady* to provide relief if a police officer makes a false statement to a prosecutor by arguing that an officer is 'suppressing' evidence of the truth by making the false statement. This court has already fore-closed this extension."); *see also Sornberger v. City of Knox-ville*, 434 F.3d 1006, 1029 (7th Cir. 2006) ("The Constitution does not require that police testify *truthfully*; rather the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies." (citations omitted)).

Moreover, both Hunter and Dominguez were accessible to the defense for the hearing on the motion to sup-press the identification in the criminal case. It is Carvajal's

responsibility to probe the witnesses and investigate their versions of the relevant events. There was nothing preventing Carvajal from discovering and drawing out this discrepancy between the officers' stories during the suppression hearing. Suppression does not occur when the defendant could have discovered it himself through "reasonable diligence." *Ienco*, 429 F.3d at 683; *cf. United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002). *Brady* does not require disclosure by one officer that he and another officer, both called as witnesses, have slightly different versions with respect to precisely which date they saw Carvajal's photograph or learned his name.

There is also a logical flaw in Carvajal's argument. His "claim is based on the fact that Dominguez failed to disclose to the prosecutors that he was given Carvajal's name and shown his photograph prior to the first transaction . . . while insisting the opposite in his . . . police reports and during his testimony . . . ." Appellee's Br. at 10. However, the fact that Dominguez saw the photograph or had the name prior to the first meeting itself is not impeaching. Under *Brady*, the evidence suppressed must be exculpatory or impeaching, not the fact that it was suppressed. Now, perhaps, one could, at least logically, argue that the *prosecutor's* failure to disclose that Dominguez lied violated *Brady* (thus the suppressed impeaching evidence was the fact that Dominguez lied and not the fact that he saw a photo). Carvajal did not advance such an argument, however, and regardless, it could not logically support a cause of action against *Dominguez himself*, rather than the prosecutor.

And by itself the fact that he saw the photograph before the first pickup is not exculpatory either—too many inferences have to be made to reach that conclusion. *See Harris*, 486 F.3d at 1016 ("None of the pieces of evidence [the plaintiff] points to, when considered at face value, is exculpatory. . . . [T]he evidence is arguably favorable only after several inferences are made. . . . This stretches the meaning of 'favorable' beyond that of *Brady*."). Simply because a trained officer viewed a photograph of someone he might potentially encounter in an undercover investigation—to make sure it was not someone he already knew, or someone who might know him—does not amount to exculpatory evidence. This is regular police practice—in fact, a sign of good police work. It only makes sense that an officer going undercover would gather information about the individuals he may meet, if for no other reason, to preserve his undercover status and ensure his (and others') safety. As Hunter and Dominguez testified, obtaining and looking at such information was part of their regular practice. Frankly, it is quite difficult to see at all how the regular police practice of checking a photograph before meeting someone undercover amounts to exculpatory evidence.

Similarly, there is also no "reasonable probability" that if Dominguez had disclosed that he had Carvajal's name and/or had seen the photograph prior to the April 16th pickup that his identification of Carvajal would have been suppressed or the charges dropped. *See Strickler*, 527 U.S. at 290 ("[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the

[outcome].'" (quoting *Kyles*, 514 U.S. at 435)). The judge at the suppression hearing (in response to Carvajal's challenge to the one-photo procedure used) assumed that a suggestive identification procedure had been utilized, but nevertheless concluded that there was "not a substantial likelihood of misidentification." Dominguez had an "excellent opportunity to view [Carvajal] at the time of the two money pick ups." There was also other evidence supporting the conclusion that Carvajal was involved besides Dominguez's identification—the cell phone number and car links to his ex-wife, for instance. So, even if there were something troubling about when Dominguez saw the photo, Carvajal has not shown that it would have made any difference in the outcome. If we focus on the possible impeachment aspect, the best Carvajal could have achieved is casting some doubt on Dominguez's credibility—however, he has presented no persuasive explanation that Dominguez was motivated by some malice or even that he purposefully lied. Thus any impeachment value from the inconsistent testimony between Hunter and Dominguez seems insignificant. We cannot reasonably see how the discrepancy about when a photo was seen would have caused the prosecution's entire case to unravel or the suppression judge to alter his ruling. Moreover, everyone agrees that the photograph was seen at *some* point before the end of the investigation. And the suppression hearing judge explicitly determined that the one-photo method did not undermine the reliability of the identification. *See also United States v. Brown*, 471 F.3d 802, 804-05 (explaining that a trained officer viewing photographs is not the same as a

witness "trying to separate a culprit from a crowd"); *id.* at 805 ("The officers approached the photo not as victims open to persuasion by officialdom, but as skeptics trying to check up on their new source."). Carvajal has not established a "reasonable probability" that the suppression result or the decision to go to trial would have been altered by the desired disclosure.

To conclude on this point—inconsistent police testimony does not a *Brady* violation make. Carvajal comes up short on all three elements of a *Brady* claim. Inference upon inference is needed to explain how the evidence is favorable to Carvajal. Most obviously, it is also not rightly considered "suppressed" evidence because Carvajal could have discovered Dominguez's and Hunter's inconsistent testimony himself: the hearing allowed on the identification challenge was his vehicle for doing so. And lastly, Carvajal has not established the third requirement—materiality or prejudice—because there is no reasonable probability that the failure to disclose would have altered the outcome of the suppression or caused the prosecutor to forego the trial.

Since there was no *Brady* violation, we conclude, under the first step in the qualified immunity analysis, that the facts, taken in the light most favorable to Carvajal, do not establish a constitutional violation on the part of defendant Dominguez. Therefore, the district court erred in failing to find that Dominguez was entitled to qualified immunity. As such, his motion for summary judgment should have been granted.

Three other matters deserve brief comments.

The district court reached the second step of qualified immunity analysis in concluding that the obligation to disclose impeaching or exculpatory information would have been clear to a reasonable law enforcement officer. Given our conclusion that no *Brady* violation occurred here, we do not need to evaluate that aspect of the ruling. Nonetheless, a more careful examination of this question should have produced a different result. The question at this step, if reached, would not be whether a law enforcement officer would clearly know that he had to disclose impeaching or exculpatory information. That assumed the result. Rather, the question should have been whether it was clear that a law enforcement officer would have been expected to disclose whether he had seen a photo of a suspect before he went to a potentially dangerous undercover meeting with that individual. As noted, good police practices and common sense would suggest that an officer ought to prepare in that way. We are aware of no case which clearly indicates, or even hints, for that matter, that a law enforcement officer would be expected to disclose that he had undertaken such preparation. It is about the equivalent of strapping on a concealed weapon or reviewing a suspect's prior criminal history before attending such an undercover encounter. Unless clear guidance is given that such a practice must be disclosed as potentially impeaching or exculpatory, the broad protection of qualified immunity should protect a law enforcement officer from liability for failure to mention viewing a suspect's photo before meeting with him.

We also pause briefly to consider, and express our doubts, about some other aspects of Carvajal's claim. First we are doubtful, in addition to the specific reasons explained *supra*, that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation. The district court's "prospective" test does not seem to accurately capture what *Brady* protects and misunderstands the "materiality" requirement in a true *Brady* violation. We find the following from the Supreme Court to be instructive on this point:

> [T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material"—although strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Strickler*, 527 U.S. at 290. "[T]he question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 289. Therefore, while a prosecutor has to make decisions about what is *Brady* material prospectively, so to speak, a true constitutional violation is measured with the outcome in mind.[2]

---

[2] The plaintiff, as well as Illinois district judges in similar cases, pointed to *Carey v. Piphus*, 435 U.S. 247 (1978), in support. We find this reliance misplaced. In addressing a high school stu-

(continued...)

We are equally doubtful, given the considerations in deciding whether to recognize a *Bivens* cause of action,[3] that such an action exists for a *Brady* violation. Most specifically it seems that there is an "alternative, existing process for protecting the interest": namely, the disclosure obligation put on the prosecution under *Brady* itself protects the defendant's interest in a fair trial, and, the fact that if a criminal defendant does establish a *Brady* violation he already has a remedy in getting his

---

[2] (...continued)

dent's suspension without a hearing, the Court concluded that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id.* at 266. In doing so, the Court was focusing on fair process and was not holding that there was any actual damage or harm resulting from the insufficient process. Therefore, there is not a parallel from *Carey*'s holding to the materiality/prejudice requirement of *Brady*, which requires more in order to establish the constitutional violation at issue. Additionally, unlike the instant case, *Carey* was a § 1983 action.

[3] The Supreme Court outlined, in *Wilkie*, 127 S. Ct. at 2598, the two step analysis for whether there is a *Bivens* cause of action: (1) "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages"; and (2) "even in the absence of an alternative, a *Bivens* remedy is a subject of judgment: 'the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, playing particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation.'"

conviction overturned (of course, an acquittal from the outset, as the defendant received here, is even better). However, we need not labor over these points any longer because it was abundantly clear, as we explained *supra*, that the allegedly suppressed evidence on these facts simply does not rise to the level of a *Brady* violation, and Dominguez is entitled to qualified immunity on that claim.

### III. Conclusion

For the foregoing reasons, we REVERSE the denial of summary judgment on Count Three of Carvajal's Amended Complaint.