In the

# United States Court of Appeals
### For the Seventh Circuit

No. 24-2647

CHONG L. LEE,

*Petitioner-Appellant,*

*v.*

BRADLEY MLODZIK, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:22-cv-00620 — **William C. Griesbach**, *Judge.*

ARGUED OCTOBER 30, 2025 — DECIDED MARCH 24, 2026

Before LEE, PRYOR, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* The State of Wisconsin violated
Chong Lee's Fourteenth Amendment Due Process rights
while prosecuting him for murder. It failed to disclose that it
interviewed three eyewitnesses, contrary to *Brady v. Maryland*, 373 U.S. 83 (1963). And it intentionally destroyed recordings of those interviews to ensure he and his counsel could
not obtain them, contrary to *California v. Trombetta*, 467 U.S.
479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).

Setting aside the details of these doctrines, which we explain below, we stress at the outset that hiding and then destroying evidence undermines the foundational due process principles upon which our criminal justice system relies. The State should think hard about the conduct that brought this case before us.

But we are not simply asked to consider whether there was a constitutional violation. Rather, this is a habeas corpus action challenging the state trial court's chosen remedy for the State's conduct. In habeas terms, we must decide whether the last state court to review the petitioner's conviction, the Court of Appeals of Wisconsin, acted contrary to or unreasonably applied federal law. This is a high bar for the petitioner to clear. Because we find he has not cleared it, we must affirm the district court's judgment denying him a writ of habeas corpus. Though let us be clear: our decision today should not be read as an endorsement of the State's conduct.

## I. Background

We recount the relevant factual and procedural background of Chong Lee's original conviction, direct appeal, and habeas proceedings. Since a handful of people discussed below share last names, we use everyone's first name after introducing them in full. Like the parties, we draw many of these undisputed facts from the most recent state-court decision that addressed Chong's claims, *State v. Lee*, 939 N.W.2d 427 (Wis. Ct. App. 2019) (per curiam) (table).

### A. Underlying Facts

Chong's convictions arose from a murder at a bar called the Luna Lounge in Appleton, Wisconsin. Just before 2:00 a.m. on December 8, 2013, Joshua Richards was shot in the

head. Video from nearby traffic cameras and a security camera inside the lounge showed the immediate aftermath of the shooting. That footage showed three people running out of the building, including Paul Lee (Chong's brother). The footage also showed Chong exiting the lounge shortly thereafter.

Three days after the shooting, officers interviewed three witnesses: Watou Lee, Mikey Thao, and Ryan Thao. All described the shooter, though none named a culprit. And they all told officers they did not want to be identified as witnesses because they feared for their safety. Officers interviewed Paul that day, too, and arrested him. They did not ask Paul about Chong because officers did not yet suspect Chong. That said, other officers interviewed other witnesses, and those other witnesses reported that Chong had admitted to the murder. Joe Thor, who also fled from the Luna Lounge just after the murder occurred, told officers the same. And when officers reinterviewed Paul, he told them Chong was the shooter.

Around a week after the shooting, the State filed charges against Chong: first-degree intentional homicide by use of a dangerous weapon and possession of a firearm by a felon. The State later added four counts of felony intimidation of a witness and a charge for solicitation of perjury (that was later dismissed).

Key here, the State never affirmatively disclosed to the defense that it had interviewed Watou, Mikey, and Ryan just days after the shooting. And though officers initially retained recordings of these interviews, they later destroyed them. As one officer explained, Watou, Mikey, and Ryan feared for their safety and wanted to remain hidden; destroying the recordings, the officer said, ensured "the defense would [not] be able to obtain" them and thus kept the witnesses secret.

Nonetheless, the State accidentally disclosed the witnesses' names to the defense when it turned over other evidence. This inadvertent disclosure prompted officers to reinterview Watou, Mikey, and Ryan. "That way," one officer later testified, "if the defense would like to question [them], then [they have] already given a statement to the police." After recording these new interviews, officers turned the recordings over to the defense, again without disclosing that the first interviews occurred.

This clumsy cover-up backfired: in listening to the recordings, Chong's lawyer determined officers had interviewed the three witnesses before. Accordingly, counsel requested "all reports, notes, and recordings of the initial interviews[.]" It was then the defense learned that recordings of those initial interviews had been destroyed.

Chong moved to dismiss the first-degree intentional homicide charge. He argued officers violated his due process rights twice over: first by failing to disclose the initial interviews of Watou, Mikey, and Ryan, in violation of *Brady*; and second by destroying the recordings of these interviews, in violation of *Trombetta* and *Youngblood.* Chong asked for dismissal, and alternatively for an order barring "any in court identification of" him by Watou, Mikey, and Ryan, as well as any testimony from those witnesses linking him to the murder.

The state trial court rejected Chong's *Brady* claim, but it agreed with Chong that officers violated his due process rights under *Trombetta* and *Youngblood*. Rather than dismiss, the court barred the State from calling the witnesses to testify at trial, though it permitted Chong to call them if he wished. The trial court also warned Chong that, if he called the

witnesses and asked them about the destroyed recordings, he might open the door to testimony about the witnesses' concern for their safety. Chong did not object to this remedy.

Chong ultimately did not call Watou, Mikey, or Ryan to testify. During his eleven-day trial, seven witnesses testified that Chong confessed to them, and an officer testified that Paul said Chong was the shooter. The jury convicted Chong of (among other things) murdering Richards. The trial court sentenced Chong to life in prison but made him eligible for extended supervised release beginning in February 2048.

Chong immediately sought post-conviction relief in the Wisconsin trial court (on grounds not relevant here), which was denied. Chong appealed this denial. He also appealed his conviction directly, arguing the State violated his right to due process by failing to disclose the initial interviews of Watou, Mikey, and Ryan, and intentionally destroying the recordings of those interviews. The Court of Appeals of Wisconsin affirmed his conviction and denied him post-conviction relief in the same opinion. Chong appealed to the Wisconsin Supreme Court, which declined review. *State v. Lee*, 982 N.W.2d 625 (Wis. 2020) (table). The Supreme Court denied *certiorari*. *Lee v. Wisconsin*, 141 S. Ct. 2677 (2021).

## B. Procedural History

In May 2022, Chong petitioned the federal district court for a writ of habeas corpus. He brought six claims, which the district court screened, permitting four to proceed. Of those four, only two are relevant to this appeal. Both sound in due process—specifically, a state's duty under the Fourteenth Amendment's Due Process Clause to disclose and preserve exculpatory evidence.

First, Chong argued the Court of Appeals of Wisconsin acted contrary to or unreasonably applied *Brady* when it rejected his *Brady* claim and affirmed his conviction for murder. Second, he argued the state appellate court acted contrary to or unreasonably applied *Youngblood* and *Trombetta* when—despite the State's admission to destroying the recordings—it affirmed his conviction based on the trial court's chosen remedy for the violation.

The district court rejected both claims and denied the writ. It held that "Chong has failed to cite any caselaw that would suggest that he was subjected to an unreasonable application of *Brady*, *Youngblood*, or any other clearly established federal law or its progeny." But the district court granted Chong a certificate of appealability, and Chong appealed. We appointed appellate counsel for him to litigate in this court "whether the State violated [his] due process rights when government officials first failed to disclose, and then later intentionally destroyed, recordings of three preliminary interviews with witnesses."[1]

## II. Discussion

We first set out the standard to obtain a writ of habeas corpus, then we consider Chong's due process claims under that standard. Because our review of state-court decisions is heavily constrained by statute, we must conclude that the district court correctly denied habeas corpus.

### A. Habeas Corpus

Chong petitions for a writ of habeas corpus under 28 U.S.C. § 2254, a provision of the Antiterrorism and Effective

---

[1] We thank appointed counsel for their able advocacy.

Death Penalty Act of 1996. Under section 2254, "a federal court may not issue a writ of habeas corpus on a claim rejected on the merits in state court unless the petitioner surmounts high obstacles." *Nichols v. Wiersma*, 108 F.4th 545, 552 (7th Cir. 2024). To obtain relief, Chong must show that "he is in custody in violation of the Constitution or laws or treaties of the United States." *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011) (quoting 28 U.S.C. § 2254(a)).

Relevant here, Chong is entitled to relief under section 2254 if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). A state-court decision is "contrary to" federal law if it "applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently" than the Supreme Court has "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court applies federal law "unreasonably" if, after identifying the correct legal test from Supreme Court precedent, it "unreasonably applies it to the facts of the particular case." *Id.*

Section 2254 guards against only "'extreme malfunctions in the state criminal justice systems'" and is "not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)). Accordingly, our review under section 2254 is "significantly constrain[ed,]" *Searcy v. Jaimet*, 332 F.3d 1081, 1087 (7th Cir. 2003), and "highly deferential," *Davis v. Ayala*, 576 U.S. 257, 269 (2015). Only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with

[the Supreme] Court's precedents" will we intervene. *Harrington*, 562 U.S. at 102.

As the Supreme Court explained recently, applying this standard faithfully sometimes puts federal courts "in the disagreeable position of having to deny relief in cases they would have analyzed differently if they had been in the shoes of the relevant state court." *Klein v. Martin*, 146 S. Ct. 589, 593 (2026) (per curiam). Even when put in that position, we are "dutybound" to abide by section 2254's constraints. *Id.*

In conducting our analysis, we review "the decision of the last state court to rule on the merits of [Chong's] claim." *Stern v. Meisner*, 812 F.3d 606, 609 (7th Cir. 2016) (citation omitted). Here, that is the Court of Appeals of Wisconsin. *Lee*, 939 N.W.2d 427. We review *de novo* the district court's conclusion that the state court did not act contrary to or unreasonably apply federal law. *Kidd v. Gomez*, 2 F.4th 677, 679 (7th Cir. 2021).

Mindful of the constraints imposed by section 2254, we turn to Chong's claims.

## B. Chong's Claims

Chong's claims concern a state's twin duties to disclose and preserve exculpatory evidence. As the Supreme Court explained in *Brady*, the Due Process Clause of the Fourteenth Amendment requires a state to affirmatively disclose material, exculpatory evidence to a defendant. 373 U.S. at 87; *United States v. Agurs*, 427 U.S. 97, 107 (1976). Similarly, as the Court explained in *Trombetta* and *Youngblood*, the Clause also imposes a corollary duty to preserve potentially exculpatory evidence on behalf of a defendant. *Nichols*, 108 F.4th at 553.

Chong argues the Court of Appeals of Wisconsin, in affirming his conviction, acted contrary to or unreasonably applied federal law. He makes two specific arguments: one based on *Brady*, and another based on *Trombetta* and *Youngblood*. Taking these claims in turn, we ultimately conclude the Court of Appeals of Wisconsin did not unreasonably apply or act contrary to federal law.

1. *Wisconsin's Application of* Brady

Chong argues the Court of Appeals of Wisconsin erred when it concluded the State's failure to disclose evidence did not constitute a *Brady* violation. But deferring to the Court of Appeals of Wisconsin, as we must, we conclude the district court correctly rejected Chong's *Brady* claim.

*Brady* is a cornerstone of our criminal adversarial system. It ensures defendants have access to the evidence they need for their defense. Failing to observe *Brady* can risk innocent defendants' life and liberty. In one example, a man was wrongfully convicted—and sentenced to death—because a state violated *Brady*. *Connick v. Thompson*, 563 U.S. 51, 54 (2011). He served eighteen years in prison total, fourteen of them on death row. But for finding the undisclosed evidence a month before his scheduled execution, he would have been wrongfully executed. *Id.*

That said, a state does not commit a cognizable *Brady* violation every time it fails to disclose exculpatory evidence. While "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence … there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a

different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (footnote omitted).

To prove a "true *Brady* violation," then, a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) it was favorable to the accused; and (3) prejudice to the defendant ensued, i.e., the evidence was material. *Strickler*, 527 U.S. at 281–82. The only elements at issue here are the second and third—whether the evidence was favorable to Chong and whether it was material—because the State conceded that it "suppressed" evidence of its initial interviews with Watou, Mikey, and Ryan. *Lee*, 939 N.W.2d 427, at ¶ 22.

We begin with favorability. Evidence is favorable if it is "exculpatory or impeaching." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) (citing *Youngblood,* 547 U.S. at 869–70). Chong argues the evidence the State suppressed—the witnesses' initial statements to officers—was exculpatory for three reasons: the witnesses did not identify him as the shooter despite describing the shooter to officers; officers arrested Paul after the interviews, suggesting that the witnesses implicated Paul; and police would not have destroyed the recordings unless they exculpated him.

The Court of Appeals of Wisconsin rejected these arguments. *Lee,* 939 N.W.2d 427, at ¶¶ 24, 26–28. It labeled Chong's assertion that the witnesses did not identify him "misleading" because nothing suggested the witnesses specifically identified any suspect. *Id.* at ¶ 25. Nor, the court observed, was it likely the witnesses would have named Chong anyway. Two of the witnesses did not know Chong at that time, and the third thought Chong was in jail when the shooting occurred. *Id.* at ¶ 26. Next, the state court said Chong's "assertion that

the interviews must have supported a theory that Paul was the shooter is pure speculation" with no supporting evidence. *Id.* at ¶ 27. Finally, the state court added that "the mere fact that the recordings were destroyed does not compel a conclusion that they contained exculpatory evidence." *Id.* at ¶ 28.

Chong claims the Court of Appeals of Wisconsin was too strict in rejecting his favorability argument. "In typical *Brady* cases," Chong asserts, "evidence is withheld and then disclosed before trial, so the parties are provided a complete record to assess the previously withheld evidence's favorability." But this did not occur here. The evidence was suppressed and then destroyed, so Chong "cannot state for certain" whether the interviews exculpated him and thus were favorable.

We take Chong's point that the State's prior conduct has hamstrung him now. Without recordings of these initial interviews, Chong has only circumstantial evidence to make his case. And were we deciding this issue in the first instance, this circumstantial evidence, and his well-crafted argument, might be enough on this record to grant him relief. But we do not review the Wisconsin court's decision anew. Section 2254 requires we give the state court great deference. *Davis*, 576 U.S. at 269. Not even "clear error" is enough to reverse in this context. *Nichols*, 108 F.4th at 552. We grant relief only if "the state appellate court plainly contradicted the Supreme Court's governing rule[,] … came to a result different than the Supreme Court did on substantially identical facts," or applied Supreme Court precedent in an "objectively unreasonable" way. *Id.* at 555, 557 (citations omitted).

We cannot conclude Chong met any of these demanding standards for habeas relief. The Court of Appeals of

Wisconsin set out the correct standard to analyze favorability under *Brady*. *Lee*, 939 N.W.2d 427, at ¶ 23 ("Favorable evidence encompasses both exculpatory and impeachment evidence."). In determining whether the state court unreasonably applied this standard, we look to federal law as announced by the Supreme Court, not precedent from our Circuit. *Nichols*, 108 F.4th at 554. Chong points to no precedent from the Supreme Court, and we have found none, granting a defendant relief on facts indistinguishable from these. *See Bell*, 535 U.S. at 694. And though Chong's *Brady* arguments may have persuaded us on direct review, we cannot say that the Court of Appeals of Wisconsin unreasonably applied *Brady* in rejecting them. The available record evidence is equivocal at best on the favorability of the suppressed witness statements. Under these circumstances, the state court's decision to deny Chong relief was not erroneous "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Because we conclude the state court did not act contrary to or unreasonably apply federal law in holding the suppressed evidence was not favorable to Chong, we affirm the district court's judgment on this claim. And because we affirm on this basis, we do not address Chong's argument that the state court acted contrary to or unreasonably applied federal law in holding the suppressed evidence was not material under *Brady*.

2. *Wisconsin's Application of* Trombetta *and* Youngblood

Chong next argues he is entitled to habeas relief based on *Trombetta* and *Youngblood*. "The Supreme Court's decisions in *Trombetta* and *Youngblood* govern a state's duty under the Due

Process Clause of the Fourteenth Amendment to preserve evidence on behalf of a defendant." *Nichols*, 108 F.4th at 553 (citation omitted). "[T]he destruction of potentially exculpatory evidence violates a defendant's right to due process if: (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *Id.* at 554.

Chong's claim does not turn on whether the State violated *Trombetta* and *Youngblood*—everyone agrees it did—but on whether the state court provided an appropriate remedy. He argues the remedy, permitting him (but not the State) to call the witnesses with the proviso that he might open the door to harmful testimony, violated due process. And he argues that the Court of Appeals of Wisconsin acted contrary to or unreasonably applied *Trombetta* and *Youngblood* in affirming the trial court's remedy.

Before addressing the merits, we note this argument is likely defaulted for the purposes of habeas. "A state prisoner must give the state an opportunity to correct alleged violations of federal rights by fairly presenting his claim through a full round of state court review." *Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999)). "The failure to do so results in procedural default" and usually precludes our review. *Id.* After the state trial court denied Chong's request to dismiss and imposed its alternative remedy, Chong did not object. Indeed, the Court of Appeals of Wisconsin concluded Chong waived any argument against the remedy because he did not object to it at trial. *Lee*, 939 N.W.2d 427, at ¶ 52.

That said, this default does not preclude our review here. Procedural default is not jurisdictional. That is because it is an affirmative defense a state can forfeit or waive. *Blackmon*, 823 F.3d at 1100 (citing *Trest v. Cain*, 522 U.S. 87, 89 (1997)). The State notes many times in its briefing that Chong did not object in the state trial court, yet it does not press procedural default. Accordingly, we consider Chong's argument on the merits.

Chong argues "the Wisconsin courts failed to fashion a remedy that reasonably applies *Youngblood* and *Trombetta*." In his view, the trial court's remedy was no remedy at all because it "left [him] with a Hobson's choice." If he exercised his right to call the witnesses at trial, he might have opened the door to harmful testimony and been unable to impeach them based on their December 2013 statements to police; yet not calling them meant forfeiting any testimony that might exculpate him.

We accept that Chong was in a tough position and that calling the witnesses presented substantial risk. But risk is inherent to criminal defense. Trials are replete with these sorts of tactical and cost-benefit considerations regarding which witnesses to call and what testimony to elicit. And the remedy Chong received was not insubstantial: after all, he managed to take three eyewitnesses off the prosecution's witness list and avoid the risk that they might incriminate him.

To be sure, a different remedy might have been better for Chong. He might have sought an adverse-inference instruction—an instruction permitting the jury to presume the recordings officers destroyed were favorable to him or unfavorable to the State—in addition to barring the State from calling the witnesses. *See* Wayne R. LaFave *et al.*, 6 Crim. Proc.

§ 24.3(e) (5th ed. 2025); *cf. Downing v. Abbott Laboratories*, 48 F.4th 793, 812 (7th Cir. 2022) (discussing adverse-inference instructions as a remedy for spoliation of evidence in the civil context). Many state courts have held an adverse-inference instruction is an appropriate remedy when a state flouts *Trombetta* and *Youngblood*, even where a state does not destroy evidence in bad faith. *See State v. Richardson*, 452 N.J. Super. 124, 138–39 (App. Div. 2017) (collecting cases from several states).

But we cannot grant habeas merely because we can imagine ways the trial court could have crafted a better remedy. *See Harrington*, 562 U.S. at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* We could intervene here only if we conclude federal law indisputably forbids the remedy the Wisconsin court imposed or compels a different remedy. *See Bell*, 535 U.S. at 694.

On this record, we cannot conclude the state court acted contrary to or unreasonably applied federal law. Neither *Youngblood* nor *Trombetta* discusses whether the Constitution compels a specific remedy when a state destroys evidence. *Youngblood* did not discuss remedies at all, likely because the Supreme Court determined no violation occurred there. 488 U.S. at 57–59. And *Trombetta* mentioned remedies only in passing. It noted that "fashioning remedies for illegal destruction of evidence can pose troubling choices" before stating (in *dicta*) that "the court must choose between barring further prosecution or suppressing" evidence. 467 U.S. at 486–87.

Chong has identified no other precedent from the Supreme Court, and we have found none, rejecting the state court's chosen remedy or requiring a different remedy.

Accordingly, we cannot grant him relief on this claim, and we affirm the district court's judgment rejecting it.

### III. Conclusion

For the reasons set forth above, we AFFIRM the district court's judgment denying the petition.