In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-1216

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID HOLLY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cr-00485-1 — **Thomas M. Durkin**, *Judge.*

ARGUED SEPTEMBER 4, 2019 — DECIDED OCTOBER 18, 2019

Before ROVNER, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Unreasonable seizures violate the
Fourth Amendment while voluntary encounters with the po-
lice do not. This case implicates the dividing line. A police of-
ficer rushed to approach David Holly in Chicago's Altgeld
Gardens Housing Complex and asked if he had a gun. Holly
answered yes, which resulted in his arrest and subsequent
conviction for possessing a firearm as a convicted felon. Holly
later moved to suppress the gun, contending that the officer's

approach and questioning constituted an impermissible seizure. The district court denied that motion after finding that Holly consented to the encounter. We agree and affirm. In the totality of circumstances, Holly's interaction with police fell on the voluntary side of the line.

## I

### A

On December 31, 2015, Officers Robert Caulfield and Joseph Byrne of the Chicago Police Department were patrolling the Altgeld Gardens Housing Complex, a public housing project in the city's far south side. The officers were in uniform and on patrol as part of a CPD effort to increase police visibility in anticipation of celebratory gunfire to usher in the new year. They drove an unmarked black Ford, which Officer Byrne later testified locals recognized as a police car. While sitting in the car, Officers Byrne and Caulfield saw David Holly walking on a sidewalk inside a courtyard of the complex.

The parties dispute what happened next, but all agree that the police approached Holly in the courtyard and asked him if he had a gun. Holly immediately said yes. The police then confiscated the gun and arrested him. A grand jury later indicted Holly for possessing a firearm following a prior felony conviction, in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the gun, arguing that his encounter with the police was an impermissible seizure. He also moved to dismiss the indictment, contending that the police's failure to preserve video footage of his arrest and activity leading to it violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). The district court held a hearing on both issues and

heard competing testimony from Holly and the police. It then denied Holly's motions.

The testimony from the hearing frames the issues on appeal. The officers testified that they had entered a parking lot in Altgeld Gardens to get a better view of the interior courtyard, which Officer Byrne considered a high-crime area based on arrests he had made there before. Around 4:00 p.m., Officer Byrne saw Holly walking on a sidewalk toward the police car. Officer Byrne said that as Holly neared the car, he made eye contact with the officers, formed a surprised and anxious look, and then turned sharply and walked swiftly in another direction, ultimately making his way behind a building and out of the officers' sight. Both officers testified that Officer Caulfield then jogged after Holly and found him inside the courtyard, standing outside an apartment door and ringing the doorbell. (An occupant later told the officers she did not know Holly.)

Officer Caulfield said that he identified himself as police and asked Holly a single question: Do you have drugs or a gun? Yes, Holly replied, he had a gun in his pocket. Officer Caulfield took the gun and from there turned Holly toward a wall to arrest him. By then Officer Byrne had reached the apartment and assisted Officer Caulfield by handcuffing Holly. Both officers testified that at no point did they draw their own guns or touch Holly before placing him under arrest. A third officer, Raul Casales, responded to a backup call and met Officers Caulfield and Byrne about 15 to 20 seconds after Holly's arrest. Officer Casales testified that he had drawn his gun but never pointed it at Holly.

Holly offered a starkly different account. He testified that he never saw the police car or made eye contact with any

officer before being stopped and handcuffed. Holly instead stated that he was ringing a friend's doorbell when he saw Officer Caulfield run around the corner and approach him with his gun drawn. According to Holly, Officer Caulfield then demanded that he put his hands up, grabbed him, and told him he was being stopped because there were burglaries in the neighborhood. Holly added that he did not feel free to leave because he had lived in the neighborhood for decades and knew the police stops there to be aggressive. Holly also diverged from the officers' accounts regarding the sequence of events surrounding his arrest. He insisted that Officer Caulfield patted him down, found a bulge, and only then asked if he had a gun. By the time Officer Byrne arrived, Holly continued, Officer Caulfield had confiscated the gun and put his own gun away.

After considering the competing testimony, the district court credited the officers' testimony. The district court explained that the accounts of Officers Caulfield, Byrne, and Casales were consistent with each other. The district court noted that the officers' testimony made more sense than Holly's, observing in particular that the police do not typically draw their weapons on an unarmed offender or at close range. By contrast, the district court found Holly less credible given his criminal history and the fact that he had offered three shifting explanations for why he had a gun. Having credited the officers' accounts, the district court then concluded that Holly's encounter with the police was consensual and denied his motion to suppress.

B

The district court also heard testimony about Holly's second claim on appeal—that he was denied due process when

the police failed to preserve a video taken near his arrest. On this score, the facts are straightforward and unfortunate.

Immediately after Holly's arrest, Detective Peter Scatena and Officers Byrne and Caulfield reviewed a video from the only nearby camera that captured what transpired. Detective Scatena then called Carlos Mackie, an analyst with the Chicago Housing Authority, to request a copy of the video. When Mackie did not answer, Detective Scatena left a voicemail (consistent with CPD protocol). What Detective Scatena did not know was that Mackie was on military leave and out of the office for an extended period. He never heard back from Mackie, followed up on the voicemail, or sought the video some other way. And because CHA cameras automatically rewrite footage after 15 to 30 days, the video taken near Holly's arrest was eventually overwritten and thus no longer available.

The district court heard conflicting testimony of what the video revealed before it was overwritten. For his part, Detective Scatena testified that the footage showed Holly in the courtyard walking at a hurried pace with two CPD officers following "side by side" in the same direction. (Recall that Officers Byrne and Caulfield had testified that Officer Caulfield pursued Holly *ahead* of Officer Byrne.) Detective Scatena also stated that the video did not show Holly after he was handcuffed. By contrast, Officer Byrne testified that the video only depicted Officer Caulfield standing near Holly after he was handcuffed—not the events leading up to the arrest.

While these accounts differed, the district court found the inconsistencies minor and understandable given the passage of time and the number of arrests that the police make in the ordinary course. The district court underscored that no one

who watched the video (before it was overwritten) testified that it depicted Holly's arrest. Because Holly had not established that the video was potentially exculpatory or that the police acted in bad faith by failing to preserve it, the court denied his motion to dismiss the indictment on the basis of a due process violation.

The ensuing bench trial resulted in Holly's conviction of unlawful gun possession. The district court then sentenced Holly to 90 months' imprisonment and imposed 36 months' supervised release.

## II

### A

Not every police encounter implicates the Fourth Amendment. See *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015) (citing *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). A seizure within the meaning of the Fourth Amendment takes place if, under the circumstances, a reasonable person would not feel free to leave. *Id.* A consensual encounter, on the other hand, takes place if a reasonable person would feel free to ignore the police and go about his business. *Id.*

In determining whether an encounter is consensual, we consider several factors:

- where the interaction took place, including whether it was in public;
- how many police officers were present;
- the extent to which the police presence was threatening;
- whether the officers made any show of weapons or physical force;
- the officers' language and tone;

- whether the police suggested the defendant was suspected of crime; and
- whether officers told the defendant he was free to leave.

See *id*. These factors "are neither exhaustive nor exclusive." *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

B

We agree with the district court that Holly's encounter with the police was voluntary. It is undisputed that the police spoke to Holly in public and never stopped him, redirected his route, or otherwise obstructed his walking on the sidewalk or through the courtyard. Officer Caulfield approached Holly and put a question to him—do you have drugs or a gun?—that he immediately chose to answer. See *Florida v. Royer*, 460 U.S. 491, 497 (1983) (explaining that the police do not violate the Fourth Amendment by merely approaching a person in public and asking him questions); see also *Shields*, 789 F.3d at 743–44.

The district court's other findings, which Holly has not shown are clearly erroneous, support its conclusion that the encounter was consensual. The district court reasonably credited the officers' accounts over Holly's. It found Holly's testimony strained and implausible: he was a four-time convicted felon, had an incentive to lie to escape punishment, and in the course of proceedings, offered three inconsistent explanations for why he had a gun. By contrast, the district court found that the officers had no incentive at the time of the incident to engage in misconduct (as they likely believed everything was being captured on camera) and no incentive to lie in their

testimony after the fact. Considering each party's position and taking stock of their comparative credibility, the district court was on solid footing in crediting the officers' version of events. See *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) (emphasizing that a district court's determination of witness credibility "can virtually never be clear error").

Against this backdrop, the district court concluded that Holly's encounter with the police was voluntary. It found that Officer Caulfield was alone when he jogged after Holly and made no show of force—he did not pull a gun, touch Holly, or tell him to put his hands up. Rather, upon catching up with Holly, Officer Caulfield promptly asked a direct question—do you have drugs or a gun?—and instantly received an equally direct answer—yes. The question was not advanced in a coercive tone or with an accompanying threat. Given these circumstances, a reasonable person in Holly's shoes would have felt free to leave. See *Bostick*, 501 U.S. at 439; *United States v. Thornton*, 463 F.3d 693, 698 (7th Cir. 2006) (holding that an encounter was consensual where three officers approached a defendant in public and did not show weapons, touch him, or use a tone or language that would have communicated to the defendant that he was seized).

Holly disagrees. He sees this case on all fours with our decision in *United States v. Smith*, 794 F.3d 681 (7th Cir. 2015). There Dontray Smith was walking alone at night when two armed and uniformed police officers waited for him to enter an alley. *Id.* at 684. The officers then rode their bicycles past Smith into the alley and made a U-turn to face him, obstructing his path forward. *Id.* at 685. From there one officer stepped off his bike, approached Smith with his hand on his gun, and "posed a single, accusatory question to Smith: 'Are you in

possession of any guns, knives, weapons, or anything illegal?'" *Id.* Considering the location, the threatening presence of multiple officers, the aggressive nature of the questioning, and the fact that the police blocked Smith's path, we concluded that the encounter constituted a seizure. *Id.*

Holly is right that in both cases the police were in uniform, approached the defendant, and asked about a gun. But the similarities end there. The district court found that a single officer spoke with Holly in an open courtyard in the afternoon. Unlike the police in *Smith*, Officer Caulfield did not block Holly's path or draw his weapon, and the tone of his question did not compel an answer.

No doubt that line-drawing in this area of law is difficult and requires a careful parsing of exactly what took place between the police and the accused. But "[i]t is well established that a seizure does not occur merely because a police officer approaches an individual and asks him or her questions." *Id.* at 684. The district court proceeded carefully by holding a hearing, considering the competing testimony, assessing credibility, and ultimately finding that Officer Caulfield approached Holly and asked him a question—nothing more. Under these circumstances, Holly's encounter with the police was voluntary.

## III

Holly also renews his argument in the name of *Brady v. Maryland* that the police violated his due process rights by failing to preserve CHA video footage of the arrest and events leading to it. We start from a different legal marker. The proper framework for evaluating Holly's claim comes not from *Brady*, but rather from *Arizona v. Youngblood*, 488 U.S. 51

(1988). While *Brady* requires that the government disclose evidence materially favorable to the defendant "irrespective of the good faith or bad faith of the prosecution," see 373 U.S. at 87, Holly's claim is that the police failed to preserve only *potentially* exculpatory evidence.

Under *Youngblood*, the police's failure to preserve potentially useful evidence does not constitute a denial of due process unless the defendant can show that the police acted in bad faith. See 488 U.S. at 58. That standard requires proof of animus or a conscious effort to suppress exculpatory evidence and turns on an official's subjective knowledge that the evidence had exculpatory value. See *United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019). In addition to bad faith, the defendant must show that the exculpatory nature of the evidence was apparent before its destruction and that he could not obtain the same evidence elsewhere. See *id.*

Holly has not made these necessary showings. Detective Scatena made a clear effort to preserve the video: he left a voicemail requesting the video from the CHA and did so in accordance with CPD policy. Detective Scatena did not know that the analyst he contacted was on military leave. His failure to follow up may have been negligent, but it does not prove animus or a conscious effort to suppress the video. And mere negligence by police does not amount to a constitutional violation. See *Youngblood*, 488 U.S. at 58.

Nor has Holly shown that the lost video had apparent exculpatory value. Detective Scatena and Officers Byrne and Caulfield each testified that the video did not show the actual arrest. Their testimony was consistent on this score, leading the district court to find that the video did not show the initial encounter between Holly and the police and thus that any

footage "was neither exculpatory nor inculpatory." On these facts, the district court correctly concluded that the police did not violate Holly's due process rights under *Youngblood*.

To be sure, the failure of the police to preserve the video is unfortunate. Mistakes happen, though, and that is all we can say occurred here. But in closing it does seem prudent to offer the limited observation that CPD would do well to revisit its preservation protocol—all to protect the interests of CPD itself, citizens, and those like Holly who find themselves charged with crime.

Seeing no violation of Holly's rights here, we AFFIRM.