In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-1878

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY BENDER, JR.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:20-cr-20083-CSB-EIL — **Colin S. Bruce**, *Judge*.

_____

ARGUED JANUARY 23, 2024 — DECIDED MARCH 7, 2024

_____

Before ROVNER, BRENNAN, and PRYOR, *Circuit Judges*.

BRENNAN, *Circuit Judge*. While Anthony Bender was running from a traffic stop, a pursuing officer saw him pull a handgun out of his sweatpants and toss it. Bender was caught, arrested, and charged with unlawful possession of a firearm. Although many officers responded to the scene, at trial, the government submitted video footage from just one dashboard camera, which did not capture the gun. A jury found Bender guilty. He was convicted and sentenced to 96 months

in prison, lower than the Sentencing Guidelines' recommended range but higher than the defense requested.

Bender disagrees with the government's conduct during his trial, the jury's credibility determinations while deliberating, and the judge's decision not to sentence him even further below the Guidelines range.

We see no errors, so we affirm Bender's conviction and his sentence.

**I.**

**A.**

On November 14, 2020, two law enforcement officers attempted to pull over a maroon Hyundai in Kankakee, Illinois. The driver did not stop immediately. Instead, he drove a few blocks, pulled into a bank parking lot, threaded through one of the ATM lanes, and stopped. The officers followed and stopped behind the car. Illinois State Trooper Blake Harsy, who joined the pursuit, also pulled into the lot behind the vehicles.

Bender opened the front passenger door, looked at Harsy, and took off running into an alley between the bank and a church. Soon, he reached a fence bordering the church's courtyard and hurdled it. The rectangular yard was surrounded by fences on two sides forming a right angle and the church's walls on the other two sides. The only way out of the yard was back over the fences.

So, Bender ran across the courtyard to the other fence, attempted to jump it, but slipped and collided with it. He turned around, ran back toward the first fence, and jumped

out of the courtyard and into the alley, where Harsy was waiting for him.

Harsy had been following Bender in his squad car, which had a dashboard camera recording the events. He exited his car as Bender jumped into the courtyard. And when Bender jumped out of the yard, Harsy was near the corner formed by the two fences.

Bender landed in a crouching position and Harsy saw him reach with "his right arm … around the front of his body." Then, as "that arm came out and went straight to the ground," Harsy saw Bender toss a firearm away. After Harsy saw Bender "throw it to the ground," the gun then "slid towards [his] patrol car." The handgun passed under his car and stopped near the rear passenger-side tire. Leaving the gun, Harsy chased Bender until he could tase him. Subdued, Bender was handcuffed and walked to a patrol car.

Soon after, Illinois State Trooper Derrick Hosselton arrived on scene. He saw Bender sitting inside Harsy's patrol car and the gun lying next to the car. He accompanied Bender, who was taken by ambulance, to the hospital. He then transported him to the County jail.

## B.

A grand jury indicted Bender, who has a prior felony conviction, for unlawful possession of a firearm under 18 U.S.C. § 922(g)(1). Bender proceeded to jury trial, at which Harsy, Hosselton, and others testified. Only a few pieces of evidence are relevant for Bender's appeal.

First, Bender's attorney established that when Bender was arrested, he was not wearing any type of holster; when concealed in a waistband, either the clip or the magazine of a

handgun with an extended magazine might be visible; and, when a person is running, a gun in a loosely fitting waistband might fall out. Second, Hosselton testified he could see the handgun on the ground next to Harsy's car, as well as that his patrol car had a dashboard camera. Third, Harsy, who had the most interaction with Bender after the traffic stop, testified to the facts above. To supplement Harsy's testimony, the government introduced several clips from the dashboard camera videos from Harsy's patrol car. It introduced no clips from Hosselton's camera.

Harsy's car had two cameras—a front-facing "dashcam" and an "in-car" camera facing the interior. Because Harsy was pulling into the bank parking lot as Bender began running, the dashcam captured Bender's flight. Specifically, it recorded Bender exiting the car, a bulge on the left side of Bender's back, and Bender touching that area with his left hand. The camera's angle meant the camera did not record Bender tossing the handgun. Nor did that video show the gun in Bender's possession or on his person. So, officer testimony was the only actual evidence of possession.

Before the court submitted the case to the jury, Bender's counsel asserted the government violated *Brady v. Maryland* by failing to turn over the dashcam footage from Hosselton's squad car. Bender's counsel did not elaborate, other than to say he did not think the government's failure to turn the footage over was in bad faith. The government responded that Bender's request came the morning before trial and, although the government looked for the footage, it could not locate it because it "does not exist." Replying, Bender's counsel said the dashcam should have been disclosed because it provided a view of the scene and thus could be used to impeach

Hosselton and Harsy's testimony that the firearm was on the ground near the patrol car. But Bender's counsel conceded the video "was not … essential," and admitted it would not have captured anything relevant to whether Bender had a firearm on him.

The court ruled that the government did not violate *Brady* by failing to disclose the video, citing two reasons. First, the video "appear[ed] not to exist." Second, abundant evidence was admitted about the location of the gun, and it was "virtually impossible" for the video to show the gun on the ground. Thus, the video at best would have been minimally probative and "not … worth presenting." The jury returned a guilty verdict.

Before the sentencing hearing, Bender filed a memorandum asking for a 60-month sentence. The Guidelines range was 110–120 months' imprisonment. In the memorandum, Bender pointed to his parents' separation when he was 11, his decision to flee instead of fight the responding officers, and the PSR's "unreasonably inflated" recommended Guidelines range. Specifically, he said the PSR should not have taken into account an offense he committed as a juvenile but for which he was charged as an adult or the "unproven allegations that he possessed the firearm in connection with another felony offense."

The district court sentenced Bender below the Guidelines range to 96 months' imprisonment. The court explained the sentence under the 18 U.S.C. § 3553(a) factors and noted the support Bender has received from his family. It also recognized that Bender committed many of his prior convictions as a juvenile. Bender appeals.

## II.

Bender raises three challenges. First, he says the government violated due process by failing to disclose a dashboard camera video. Second, he says the video the government did disclose contradicts the arresting officer's testimony. Third, he says the district court's sentence was unreasonable.

## A.

First, citing *Brady v. Maryland*, 373 U.S. 83 (1963), Bender argues the government violated his due process rights by failing to disclose the camera footage from Hosselton's squad car. *Brady* applies when the evidence is exculpatory. *See id.* at 87-88. But nobody knows what may have been on Hosselton's dashcam video. So Bender needs the rule in *Arizona v. Youngblood*, which applies when evidence might be exculpatory, but the government failed to preserve it. 488 U.S. 51, 58 (1988).

We have encountered this mistake before. In *United States v. Holly*, a video that may have captured footage of an arrest was automatically overwritten when the police failed to preserve it. 940 F.3d 995, 999 (7th Cir. 2019). Two police officers watched the video but at trial testified to different versions of what it captured. *Id.* The defendant argued that the government violated *Brady*, and we pivoted to *Youngblood* because his claim was "that the police failed to preserve only *potentially* exculpatory evidence." *Holly*, 940 F.3d at 1001.

So too here. Bender and the government can only guess about what Hosselton's dash camera captured. It may have recorded something exculpatory; it may not have. Its exculpatory character is only potential.

*Youngblood* requires Bender to show that the government acted in bad faith, the evidence was apparently exculpatory prior to its disappearance, and the "evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Stallworth*, 656 F.3d 721, 731 (7th Cir. 2011) (quotation omitted); *Youngblood*, 488 U.S. at 57–58. Bender cannot show either of the first two elements.

He cannot establish that the government acted in bad faith, which his counsel admitted at the time of the motion. Bad faith "requires proof of animus or a conscious effort to suppress exculpatory evidence" and "turns on an official's subjective knowledge that the evidence had exculpatory value." *Holly*, 940 F.3d at 1001–02. In *Holly*, we held the defendant could not show bad faith because the detective attempted to preserve the video; it was at best "negligent" for him not to follow up. *Id.* at 1002.

Bender offers no evidence that the government consciously suppressed the video or acted with animus. *See United States v. Fletcher*, 634 F.3d 395, 408 (7th Cir. 2011) (defendant presented no evidence of bad faith and his Youngblood challenge failed). We simply do not know what happened to it. Indeed, although the government offers "[n]o explanation … for the missing material, … it is plausible that there is an innocent" one. *Stallworth*, 656 F.3d at 731.

It is most likely that, as the government suggests, the video was reviewed, determined not to be material, and allowed to be overwritten automatically. *See id.* (one plausible explanation for a video's disappearance would be its deletion due to "routine … video record maintenance."); *United States v. Bell*, 819 F.3d 310, 318 (7th Cir. 2016) (no *Youngblood* violation when

witness testified that video was taped over as a matter of routine). It was established at trial that Harsy's dashcam overwrites automatically after two days unless the video is preserved, and Hosselton works for the same department.

If this case truly involved a *Brady* challenge, Bender could be forgiven for not offering evidence of bad faith; it is not an element of a *Brady* violation. *Youngblood*, 488 U.S. at 57. But a *Youngblood* claim requires proof of bad faith, 488 U.S. at 58, and he has not offered any. Moreover, both *Brady* and *Youngblood* require evidence of exculpatory value. Bender cannot meet that showing either.

The district court considered the layout of the bank parking lot and where the police cars stopped. The court found that "it would be virtually impossible" for the forward-pointing camera to show the gun on the ground. This is a factual finding, which we review for clear error. *United States v. Edwards*, 34 F.4th 570, 587 (7th Cir. 2022). And Bender offers no reason for us to think it is erroneous. There was no due process violation, and the district court did not err by holding as much.

**B.**

Second, Bender argues the verdict was not supported by sufficient evidence that he possessed the handgun. The only evidence of possession was Harsy's testimony that Bender had the gun in his waistband and threw it while fleeing.

Bender's argument is this: A gun tucked into a waistband would fall out, protrude, or otherwise be visible if the wearer were jumping over fences and running through parking lots, as Bender was. The video does not capture the gun or any part

of it. Thus, it is "impossible" that the gun was tucked into his waistband.

"[W]e review the evidence in the light most favorable to the Government and will overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could have found guilt beyond a reasonable doubt." *United States v. Norwood*, 982 F.3d 1032, 1039 (7th Cir. 2020). And when a defendant puts the jury's credibility determination in the crosshairs, that finding "will be set aside if the testimony is 'impossible under the laws of nature.'" *United States v. Miller*, 900 F.3d 509, 512 (7th Cir. 2018) (quoting *United States v. Hunter*, 145 F.3d 946, 949 (7th Cir. 1998) (quotation omitted)).

The video does not make Harsy's testimony impossible. For one, his testimony does not contradict the laws of physics. A gun secured by a waistband *might* fall out while the wearer is running and jumping, but it does not in every case. Further, Bender touched his waist during the video. The jury was entitled to find this consistent with Harsy's testimony of possession.

We reached a similar conclusion in *United States v. Miller*, reviewing for plain error. There too the only evidence of possession was testimony and a video. 900 F.3d at 512. The video did not capture the gun, but the jury could see the defendant, Miller, "hunched over" and "putting his hands over his waist." Miller argued on appeal that "it was unreasonable to conclude that he was hiding a gun with an extended magazine inside his pants when he was placed in the patrol car." We held the jury was entitled to credit the officer's testimony and that the video did not contradict it. *Id.* Harsy's testimony

was not "impossible under the laws of nature," *Hunter*, 145 F.3d at 949, so the jury did not err by finding it credible.

### C.

Third, Bender says his sentence—fourteen months below the low end of the Guidelines range—is unreasonable.

A sentence below the bottom end of the Guidelines range "is presumed reasonable against a defendant's challenge that it is too high." *United States v. Chagoya-Morales*, 859 F.3d 411, 424 (7th Cir. 2017) (quotation omitted). The appellant "bears the burden of rebutting that presumption," which he can do if he shows "the sentence is unreasonably high in light of the [S]ection 3553(a) factors." *United States v. Moore*, 851 F.3d 666, 674 (7th Cir. 2017). If, for example, the district court "offered an adequate statement of its reasons, consistent with [Section 3553(a)], for imposing" the sentence and if "the record on appeal … reveal[s] that the district judge considered the factors," the district court has discharged its duty. *United States v. Annoreno*, 713 F.3d 352, 359 (7th Cir. 2013) (quotations omitted). This court reviews a district court's decision to sentence the defendant below the Guidelines range for an abuse of discretion. *United States v. Gumila*, 879 F.3d 831, 837 (7th Cir. 2018).

The district court properly discharged its duty here. For one, it indicated in its statement of reasons that it considered six of the § 3553(a) factors. Further, it discussed each factor at the sentencing hearing. Bender disagrees. He argues the district court failed to consider other factors in his sentence. Generally, his "childhood [and] disadvantaged background"; his "nonviolent" crime of conviction; and his "attempt to flee

from the officer," rather fight or use the firearm, all mean he "should have received a shorter sentence."

First, it is unclear whether Bender's childhood is a mitigating factor at all. In the presentence report, Bender discussed some of the challenges he faced growing up, but much of his experience was positive. Second, although the nonviolent nature of the offense and his conduct are stronger justifications for a lower sentence, the district court did not abuse its discretion by concluding to the contrary. For one, the court pointed out that the situation was "potentially violent," given that a firearm was present. And it expressed concern with the size of the gun—it "had an extended clip that stuck out the back," which is more dangerous than "just a six-shooter or even nowadays the more common semi-automatic 9mm."

Bender offers no explanation for why this view of the facts is unreasonable or out of the ambit of the § 3553(a) factors, which he must do to overcome the presumption in favor of the sentence. *See Moore*, 851 F.3d at 674. At bottom, he is objecting to how the district court weighed the seriousness of the offense factor in § 3553(a)(2)(A).

That is a dead-end route. Defendants cannot overcome the presumption that a below-Guidelines sentence is reasonable by contesting the district court's weighing decision. *United States v. Haskins*, 511 F.3d 688, 696 (7th Cir. 2007) (quotations omitted); *United States v. Poetz*, 582 F.3d 835, 840 (7th Cir. 2009). Bender's below-Guidelines sentence is not unreasonably high.

## III.

The government did not act in bad faith by failing to preserve Hosselton's dashcam video. Harsy's video did not

contradict his testimony, such that there was no evidence supporting the jury's verdict. And the district court did not abuse its discretion by not imposing a shorter sentence.

For those reasons, we AFFIRM Bender's conviction and the district court's decisions on his due process claim and sentence.