In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 22-3059

KARL W. NICHOLS,

*Petitioner-Appellant,*

*v.*

LANCE WIERSMA,

*Respondent-Appellee.*

---

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:18-cv-00829-wmc — **William M. Conley**, *Judge.*

---

ARGUED DECEMBER 5, 2023 — DECIDED JULY 16, 2024

---

Before HAMILTON, BRENNAN, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Petitioner-appellant Karl Nichols was convicted in a Wisconsin state court of first-degree sexual assault and sentenced to five years of probation. He appeals the denial of his federal petition for a writ of habeas corpus challenging that conviction. Nichols contends the prosecution failed to preserve exculpatory evidence. The child-victim had prepared notes between her first and second forensic interviews identifying some corrections and clarifications she

wanted to make about what she had said in the first interview. Those notes disappeared, without explanation, from the prosecution's control. Nichols also contends that his trial counsel was ineffective for failing to raise the issue of the notes ahead of trial.

Nichols originally won relief after a post-trial hearing in the state trial court, but the Wisconsin Court of Appeals reversed and upheld the conviction. When Nichols then turned to the federal courts under 28 U.S.C. § 2254, the district court denied relief, relying on the deferential standard of review in section 2254(d) to deny relief on the due process theory and on procedural default on the ineffective assistance claim. We affirm.

I.  *Factual and Procedural Background*

The facts of Nichols' case are drawn from the state-court record. Nichols' family was part of a childcare cooperative with other families in Madison, Wisconsin, including the family of the child in question ("M.R.W."). Nichols' son and M.R.W. had play dates at Nichols' house from the time the children were approximately three years old until M.R.W.'s family moved to Kansas in 2010. In September 2011, when M.R.W. was ten years old, she told her mother that Nichols had touched her vagina during one sleepover at Nichols' house years earlier when they had lived in Madison.

M.R.W. participated in two videotaped interviews in Kansas, in September and December 2011. In the first interview, conducted by Jane Holzrichter, the director of a child advocacy center in Kansas, M.R.W. reported that she would have sleepovers at Nichols' house and that she and Nichols' son would wrestle with Nichols while they were

wearing little or no clothing. She said she would take her clothes off because she was hot and that Nichols encouraged her to do so. M.R.W. recounted one time when she was four or five years old when Nichols felt around the inside and outside of her vagina with his hands. During a sleepover, she could not sleep, went upstairs where she saw Nichols, and sat with him on a chair. She reported that Nichols told her that he "wonder[ed] what it was like having a vagina because he didn't have a vagina" and asked her if he could touch her. She let him do so because, being so young, she did not think there was anything wrong with it. M.R.W. told Holzrichter that was the only time that Nichols intentionally touched her vagina, but there was one other occasion when he incidentally touched her unclothed vagina during a sponge bath. She admitted that it was hard for her to remember everything clearly after so long, and that many of her memories blended together.

After reviewing the video of the first interview, a prosecutor in Madison, Wisconsin, asked Holzrichter to conduct a second interview in which a Madison police detective could participate. Holzrichter agreed, and Detective Justine Harris participated in the second interview by telephone. During the second interview, M.R.W. told Holzrichter that she had watched a recording of her first interview. In the second interview, M.R.W. went into more detail about what happened during the touching incident. After providing more details, M.R.W. said again that Nichols touched her vagina inside and out with his hands. She also said again that she could not recall the incidents perfectly, but she assured Holzrichter that everything she said in the second interview was true to the best of her recollection.

Nichols' constitutional claims in this habeas case focus on the end of the second interview. Holzrichter asked M.R.W. about a pad of paper that she had been holding throughout the interview: "Q: [D]id you write some things down that you were wondering about or did you write it down for someone? A: I wrote down some things that I think I, I changed from the last interview." One correction listed on M.R.W.'s pad of paper was discussed briefly. She told Holzrichter that Nichols did not suggest that she should take off her clothes when they were wrestling, just that Nichols did not object when she would do so. Holzrichter indicated her belief that M.R.W. had in fact already said the same thing in the first interview. Holzrichter then asked M.R.W. if she felt that it was her fault that she "didn't object to any of this." M.R.W. said she did, but that she felt better after she had talked to her therapist about it.

After this exchange, Holzrichter stood up, walked toward the door, and indicated that M.R.W. should say goodbye to Detective Harris on the telephone. M.R.W. stood up with her pad of paper, followed Holzrichter, and raising her pad of paper, said, "First can I tell you, um, the rest of this?" Continuing to walk out of the room, Holzrichter responded, "Sure. We can do that and then I'm going to take a copy of it so that they can have it, too." At that point, the recording of the interview ended.

In March 2012, the State of Wisconsin charged Nichols with first-degree sexual assault of a child based on the touching incident that occurred in 2005 when M.R.W. was four years old. A jury trial was held in November 2013. M.R.W. testified. Important for our analysis here, the jury also watched recordings of both interviews and received

transcripts of both. Nichols was convicted of the charged of-fense and was sentenced to five years of probation.

In May 2015, Nichols filed a postconviction motion arguing that the prosecution had failed to preserve exculpatory evidence—the handwritten list of changes between interviews—in violation of his right to due process of law, and that his counsel was ineffective for failing to raise that issue before trial. The state trial court held an evidentiary hearing on Nichols' postconviction motion. Before the hearing, the prosecution determined that the notes could not be located.

The state trial court granted Nichols' motion. The court found that the list was not preserved by the prosecution and that it contained additional exculpatory evidence. The court also found that the prosecution acted in bad faith because it did not seek out and turn over the list to the defense. The trial court reasoned that Holzrichter concealed the list by ending the interview without discussing it and by not providing it to the authorities, and that Detective Harris acted in bad faith when she produced a police report regarding the interview saying that M.R.W. had only one correction. The court concluded that the list could not be reliably re-created, and it determined that the appropriate remedy was to vacate the conviction and dismiss the case with prejudice. The court also concluded that trial counsel was ineffective for failing to seek out the list or to move for dismissal if it could not be found, but because the court had ordered dismissal with prejudice on due process grounds, the ineffective assistance claim was moot.

The State appealed to the Wisconsin Court of Appeals, which reversed and remanded. The appellate court

concluded that the trial court should have rejected Nichols' ineffective assistance and due process claims because he failed to show that M.R.W.'s missing list had any exculpatory value. Nichols sought review in the Wisconsin Supreme Court, but that court denied his petition.

Nichols then filed this habeas corpus petition in the Western District of Wisconsin in October 2018.[1] The district court denied Nichols' petition. *Nichols v. Wiersma*, No. 3:18-cv-829-WMC, 2022 WL 9979743, at *1 (W.D. Wisc. Oct. 17, 2022). It first found that his ineffective assistance of counsel claim was procedurally defaulted because he failed to include that issue in his petition for review by the Wisconsin Supreme Court. On the underlying due process claim, the district court found that the state appellate court's decision was a reasonable application of case law from the Supreme Court of the United States on the prosecution's duty to preserve exculpatory evidence, "which is as far as a federal court can inquire as part of a habeas review." *Id.* at *5. Nichols has appealed.

II.  *Analysis*

   A.  *Standards of Review*

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may not issue a writ of habeas corpus on a claim rejected on the merits in state court unless the petitioner surmounts high obstacles. To obtain federal relief on a claim that state courts rejected on the merits, the state court decision must have been "contrary to, or involved an

---

[1] Nichols completed his five-year probation sentence while his federal habeas petition was pending. He still satisfies the "in custody" requirement of 28 U.S.C. § 2254 because he was in custody when the petition was filed. See *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "based on an un-reasonable determination of the facts." 28 U.S.C. § 2254(d). A federal court considering a habeas petition "reviews the spe-cific reasons given by the state court and defers to those rea-sons if they are reasonable." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). Federal courts consider only "the decision of the last state court to rule on the merits" of the claim. *Stern v. Meisner*, 812 F.3d 606, 609 (7th Cir. 2016) (internal quotation omitted); accord, *Wilson*, 584 U.S. at 129–32. That decision here is the decision of the Wisconsin Court of Appeals. "When reviewing a district court's ruling on a habeas corpus petition," this court reviews "the district court's factual findings for clear er-ror and rulings on issues of law *de novo*." *Id*.

Under the first prong of section 2254(d), a decision is con-trary to clearly established federal law "if it applies a rule that contradicts the governing law set forth" in Supreme Court de-cisions or "confronts a set of facts that is materially indistin-guishable from" a Supreme Court decision but comes out dif-ferently. *Brown v. Payton*, 544 U.S. 133, 141 (2005). An "unrea-sonable" application of clearly established federal law must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation omitted). The petitioner must show that the state court's decision involved an error "well under-stood and comprehended in existing law beyond any possi-bility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Another obstacle to federal relief concerns the state court's factual findings. A state court's factual findings receive deference if "[r]easonable minds reviewing the record might

disagree about the finding in question." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (internal quotation omitted); accord, e.g., *Dassey v. Dittmann*, 877 F.3d 297, 302–03 (7th Cir. 2017) (en banc). To succeed under the factual prong of section 2254(d), the petitioner must show by clear and convincing evidence that the factual findings were unreasonable. See 28 U.S.C. § 2254(e)(1).

B.  *The Duty to Preserve Exculpatory Evidence*

The general principles regarding the prosecution's duty to preserve exculpatory evidence are well-established. "The Supreme Court's decisions in *Trombetta* and *Youngblood* govern a state's duty under the Due Process Clause of the Fourteenth Amendment to preserve evidence on behalf of a defendant." *McCarthy v. Pollard*, 656 F.3d 478, 484 (7th Cir. 2011), citing *California v. Trombetta*, 467 U.S. 479, 488–89 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The prosecution's duty is to "preserve potentially exculpatory evidence on behalf of defendants." *Trombetta*, 467 U.S. at 481. This duty extends to impeachment evidence as well. *Trombetta* itself analyzed whether the state had a duty to preserve Intoxilyzer breath samples that defendants would use to "impeach the machine's reliability." 467 U.S. at 490. The Supreme Court's reasoning extending *Brady*'s duty of disclosure to material impeachment evidence applies to *Youngblood*'s duty to preserve. As the Court explained in *United States v. Bagley*, 473 U.S. 667 (1985), "[i]mpeachment evidence … as well as exculpatory evidence, falls within the *Brady* rule," *id.* at 676, citing *Giglio v. United States*, 405 U.S. 150, 154 (1972), because "[s]uch evidence is 'evidence favorable to an accused' so that, if disclosed and used effectively, it may make the difference between conviction

and acquittal." *Id.*, quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963). An alternative rule excluding impeachment evidence from the scope of *Youngblood*'s duty to preserve would make little sense—prosecutors could then effectively throw away impeachment evidence that they would otherwise have a *Brady* duty to disclose.

In light of this well-established duty to preserve material exculpatory evidence, including impeachment evidence, it is difficult to fathom the loss of the child's notes in this case. It is also difficult to fathom the interviewer's response after the child's question, "First, can I tell you the rest of this?" The interviewer said "Sure," and then apparently turned off the recording of the interview.

The loss of the notes does not necessarily lead to habeas relief, however, particularly given the deference that state courts receive on federal habeas review. "The state's duty to preserve exculpatory evidence is limited to evidence that 'might be expected to play a significant role in the suspect's defense.'" *State v. Hahn*, 132 Wis. 2d 351, 358, 392 N.W.2d 464, 467 (Wis. App. 1986), quoting *State v. Oinas*, 125 Wis. 2d 487, 490, 373 N.W.2d 463, 465 (Wis. App. 1985), citing in turn *Trombetta*, 467 U.S. at 488–89. In other words, the prosecution must preserve only "material" exculpatory evidence, and evidence is material if there is a "reasonable probability" that, if it had been preserved and disclosed to the defendant, "the result of the proceeding would have been different." *United States v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009), quoting *Youngblood*, 547 U.S. at 870.

"Over the years, courts have fashioned different interpretations of the collective meaning" of *Trombetta* and *Youngblood*, and this court's interpretation of those two cases

"differs from that of Wisconsin courts." *McCarthy*, 656 F.3d at 484. In particular, we have differed as to how obvious the exculpatory value of the evidence in question must be to trigger the prosecution's duty to preserve it:

> According to Wisconsin courts, these cases stand for the proposition that a defendant's due process rights are violated if the police (1) failed to preserve "apparently" exculpatory evidence, leaving the defendant with no ability to obtain comparable evidence by any other reasonable means (with this portion of rule deriving from *Trombetta*); or (2) failed to preserve "potentially" exculpatory evidence in bad faith (with this portion of the rule deriving from *Youngblood*). *See, e.g., State v. Greenwold,* 525 N.W.2d 294, 296–98 (Wis. Ct. App. 1994). However, according to our precedent, *Trombetta* and *Youngblood* do not create two separate rules, with the former governing "apparently" exculpatory evidence and the latter governing "potentially" exculpatory evidence. We instead read both cases to stand for the same proposition: the destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means. *See, e.g., Henry v. Page,* 223 F.3d 477, 481 (7th Cir. 2000) (explaining that *Youngblood* used the word "potentially" to illustrate that the defendant

> failed the second prong—which requires the ev-
> idence's exculpatory value to be apparent—of
> *Trombetta*'s test).

*Id.* at 484–85 (footnote omitted).

In his brief, Nichols sets out the standards of *Trombetta* and *Youngblood* as elaborated by Wisconsin courts, rather than by this circuit. We have written before that it is a "dubious" proposition that the "'unreasonable application' prong of the AEDPA requires us to accept as correct Wisconsin's interpretation of *Trombetta* and *Youngblood*." *McCarthy*, 656 F.3d at 485. In this case, the district court applied this circuit's standards to determine whether the Wisconsin Court of Appeals reasonably applied *Trombetta* and *Youngblood*.

To the extent state courts and lower federal courts interpret the Supreme Court's constitutional precedents differently, the differences should not affect decisions under section 2254(d). The statute makes the decisions of the Supreme Court of the United States the ultimate touchstone. Lower federal courts may not grant habeas relief simply because they read those decisions differently than state courts do. Regardless of which rule applies, the Wisconsin Court of Appeals reasonably concluded (1) that the list had no apparent exculpatory value and (2) that the prosecution's failure to produce the list was not the result of actions taken in bad faith. The first finding bars any due process claim under this court's interpretation of the *Trombetta*/*Youngblood* framework. The second bars the alternate path to a due process claim under Wisconsin courts' interpretation and is another independent ground for barring the claim under this court's interpretation. We consider each of these two conclusions in turn.

C.  *Apparent Exculpatory Value?*

    1.  *Reasonable Application of Supreme Court Precedents*

Under both this court's and Wisconsin's interpretations of *Youngblood* and *Trombetta*, the prosecution's duty to preserve evidence depends in part on whether the exculpatory value of the evidence is apparent. "To be considered 'apparently' exculpatory, the exculpatory nature of the evidence must be apparent *before* it is destroyed. Accordingly, 'the possibility that the evidence *could* have exculpated the petitioner *if* preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*.'" *McCarthy*, 656 F.3d at 485–86, quoting *Youngblood*, 488 U.S. at 57 n.* (brackets omitted). Here, the Wisconsin Court of Appeals held that M.R.W.'s list had no value, let alone apparent value, to Nichols as either exculpatory evidence or impeachment evidence. We review that conclusion for reasonable application of clearly established Supreme Court precedent.

Nichols argues that the Wisconsin Court of Appeals unreasonably applied governing Supreme Court precedent, which he claims contemplates only two categories of evidence: "potentially exculpatory" and "apparently exculpatory." In holding that M.R.W.'s list lacked *any* exculpatory value, Nichols argues, the state appellate court avoided applying the federally required framework it had just laid out and created a new characterization of evidence. He calls this a failure to apply the correct legal standard, which is "necessarily an unreasonable application" of federal law.

We disagree. Nichols has not shown that the state appellate court plainly contradicted the Supreme Court's

governing rule or came to a result different than the Supreme Court did on substantially identical facts. *Avila v. Richardson*, 751 F.3d 534, 536 (7th Cir. 2014), citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). After setting out the correct legal standard, and in addition to its statement that the list "lacked any exculpatory value," the state appellate court wrote that "Nichols has failed to demonstrate that the list had potentially exculpatory value" and that "the exculpatory nature of the list was not apparent to the interviewer" or to Detective Harris. The state appellate court applied the correct governing federal standards as articulated by Wisconsin courts, making explicit findings with respect to each of Nichols' two categories. As required under this court's articulation of the standard, one of those two express findings by the state appellate court was that the exculpatory value of the evidence was not apparent at the time it was lost. See *McCarthy*, 656 F.3d at 485.

Nichols argues from Supreme Court dicta that even evidence that seems more probably inculpatory than exculpatory must still be categorized and treated as "potentially useful." See *Illinois v. Fisher*, 540 U.S. 544, 548 (2004). He thus contends that the state appellate court's determination that the list of corrections was not even "potentially exculpatory" was an unreasonable application of governing Supreme Court precedent. Again, we disagree. First, under our cases interpreting *Trombetta* and *Youngblood*, "apparent" exculpatory value is a required element of *every* due process claim for failure to preserve evidence. *McCarthy*, 656 F.3d at 485. An erroneous failure to label evidence correctly as "potentially" exculpatory, versus not exculpatory, is harmless. In neither case does the evidence have the "apparent" exculpatory value we require.

Wisconsin courts, by contrast, interpret *Trombetta* and *Youngblood* to allow claims for the destruction of "potentially" exculpatory evidence if the destruction was the result of actions in bad faith, even if the evidence lacks "apparent" exculpatory value. But "potentially" has its limits. The Constitution does not impose on the prosecution "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. *Trombetta* makes clear that the prosecution has no duty to preserve potentially exculpatory evidence where that evidence has only a tiny chance of turning out to be exculpatory once produced. 467 U.S. at 489 (implying no duty to preserve evidence that is "much more likely" to be "inculpatory than exculpatory").

Giving the state appellate court's decision "the benefit of the doubt" as we must on habeas review, *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002), the statement that the evidence "lacked any exculpatory value" means no more than that the court thought the chances were "extremely low" that the contents of the list would have made a jury more likely to find Nichols not guilty, either as exculpatory or impeachment evidence. See *Trombetta*, 467 U.S. at 489. Evidence that is much more likely to be inculpatory than exculpatory could reasonably be described as "lacking any exculpatory value." We have used similar language in our own cases. See, e.g., *United States v. Bender*, 95 F.4th 507, 512 (7th Cir. 2024), petition for cert. filed, No. 23-1878 (June 7, 2024) ("[B]oth *Brady* and *Youngblood* require evidence of exculpatory value. [Defendant] cannot meet that showing …."). The state appellate court's language does not, as Nichols argues, imply the erroneous creation of a "new category" of exculpatory evidence.

In any event, the state appellate court went on to address bad faith, a requirement for due process claims involving potentially exculpatory evidence under both Wisconsin courts' and this court's interpretations of *Youngblood* and *Trombetta*. The state appellate court's finding that the list "lacked any exculpatory value" did not change the legal standard it applied, rendering harmless any arguably incorrect categorization. The Wisconsin Court of Appeals did not act unreasonably in applying the Supreme Court's framework in determining that M.R.W.'s list lacked any exculpatory value.

2. *Reasonable as Findings of Fact*

We next consider the reasonableness, as a factual finding, of the state appellate court's conclusion that the list lacked *apparent* exculpatory value.[2] Federal habeas courts presume that state courts reasonably found the facts, and this rule "applies equally to findings of trial courts and appellate courts." *Wainwright v. Goode*, 464 U.S. 78, 85 (1983). "That presumption applies not only to the state court's express factual findings, but also to the implicit resolution of a factual

---

[2] As noted, this court's interpretation of *Trombetta* and *Youngblood* requires that for any due process claim to succeed, the evidence must have had *apparent* exculpatory value at the time it was lost or destroyed. *McCarthy*, 656 F.3d at 485. Under Wisconsin's interpretation, defendants may instead prove that potentially exculpatory evidence was destroyed in bad faith, an alternate route we discuss below. Here we address only whether the Wisconsin Court of Appeals' finding of no apparent exculpatory value was reasonable. A reasonable finding of no apparent exculpatory value means that Nichols' underlying due process claim fails under this court's precedent and under the "apparently exculpatory" prong of Wisconsin precedent.

dispute that can be fairly inferred from the state court record." *Armstrong v. Young*, 34 F.3d 421, 426 (7th Cir. 1994).

The state appellate court's finding was not unreasonable. Again, for evidence to be "apparently" exculpatory, "the possibility that the evidence *could* have exculpated the petitioner *if* preserved or tested is not enough." *McCarthy*, 656 F.3d at 485 (brackets omitted), quoting *Youngblood*, 488 U.S. at 57 n.*. When the "exculpatory character" of missing evidence "is only potential," such that the parties and the court "can only guess" about what it might have shown, the evidence is not apparently exculpatory. *Bender*, 95 F.4th at 511. Here, the state appellate court reversed the state trial court's finding of apparent exculpatory value as clearly erroneous, having "no basis in the record." The appellate court reasoned: "It is not possible for the [state trial] court to know whether the list was apparently exculpatory without knowing the contents of the list." We agree. M.R.W.'s corrections could have just as easily provided additional inculpatory details regarding Nichols' behavior surrounding the sexual assault. The state appellate court's factual conclusion on this point was not beyond the bounds of reason.

We are less persuaded by the state appellate court's conclusion that the list would have no apparent exculpatory value as impeachment evidence. The whole case turned on M.R.W.'s credibility. The state trial court explained: "If the jury believed M.R.W., [Nichols] would be found guilty. If the jury had a reasonable doubt as to whether they should believe M.R.W., [Nichols] would be found not guilty." App. 143. But the Wisconsin Court of Appeals overruled as clearly erroneous the state trial court's factual finding that the list had apparent exculpatory value as impeachment evidence. Instead,

the state appellate court concluded, "any corrections in M.R.W.'s list would not have risen to the level of being exculpatory evidence." The list, in other words, could not have been used effectively to attack M.R.W.'s credibility. The state appellate court wrote: "The only reasonable inference from the facts—that M.R.W. had reviewed the first interview before participating in the second interview, and that she had a list of changes to make of some things she said in that first interview—is that she spoke accurately, truthfully, and consistently with her corrections, *in the second interview*." (Emphasis added.)

A state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013), quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010). The state appellate court's findings of fact and credibility determinations against the petitioner are presumed correct, and the petitioner overcomes that presumption only if he proves by clear and convincing evidence that those factual findings are wrong. 28 U.S.C. § 2254(e)(1). Here, the state appellate court's determination of the facts was not so far "outside the boundaries of permissible differences of opinion" as to render it objectively unreasonable. See *Morgan v. Hardy*, 662 F.3d 790, 800 (7th Cir. 2011) (affirming denial of habeas petition where state court rejected "more plausible" factual account in favor of less plausible but still reasonable account), quoting *Starkweather v. Smith*, 574 F.3d 399, 402 (7th Cir. 2009).

The state appellate court explained how it reached its conclusions. Neither Nichols nor the state trial court had suggested that the list could have "corrected some fact in M.R.W.'s initial interview in a manner supporting the view

that sexual touching did not happen. Indeed, M.R.W.'s consistent, detailed recitation of the facts surrounding that incident in the two interviews and at trial would defeat such a proposition." App. 110. "More specifically, if she was telling the truth about the corrections, and through the corrections was making sure that what she had said in the first interview was accurate, then there is no basis to suspect that her detailed description of the touching incident in the second interview was not congruent with whatever corrections were on her list." *Id*. at 111. As the state appellate court reasoned, "if the jury believed her statement that she got some things wrong in the first interview, they would have believed her more detailed description of the touching incident in the second interview." *Id*.

The court further reasoned that the only example of a correction provided by M.R.W. did not concern the touching incident that formed the basis of the charge against Nichols. "[J]urors understand that a witness like M.R.W., years later, may have a faulty memory as to some related facts, but would clearly recall the dramatic event of an adult male putting his fingers into her vagina. And, as to this core event, M.R.W. described it consistently and in detail in both interviews." App. at 112. Nichols did not explain how it could "reasonably be inferred that whatever else was on the list would tend to, or lead to evidence that would tend to, establish Nichols'[ ] innocence." *Id.*

There are elements of inference bordering on speculation in the appellate court's analysis, as well as in the trial court's. That uncertainty is inherent when potential evidence of unknown content has disappeared. We understand the appellate court's explanation for its decision, and we see how

reasonable jurists could arrive at that conclusion in light of M.R.W.'s consistent testimony on the core events, and especially in light of the jury's ability to watch both video interviews and her in-person testimony to the jury. To the extent there were conflicts among those three accounts of the relevant events, they were disclosed to the defense and to the jury. The defense had an opportunity to use any such conflicts to attempt impeachment. The Wisconsin Court of Appeals was not unreasonable in finding as a matter of fact that M.R.W.'s list was not apparently exculpatory as impeachment evidence.

D. *Bad Faith*

Under Wisconsin's formulation of the *Trombetta/Youngblood* standard, even where evidence is not apparently exculpatory, a criminal defendant's due process rights can still be violated if the prosecution acts in bad faith to destroy or fails to produce merely "potentially exculpatory" evidence. See *McCarthy*, 656 F.3d at 484. The Wisconsin trial court found bad faith, but the appellate court reversed that finding as clearly erroneous. The state appellate court's factual finding on this point also was not unreasonable.

Bad faith "requires proof of animus or a conscious effort to suppress exculpatory evidence and turns on an official's subjective knowledge that the evidence had exculpatory value." *Bender*, 95 F.4th at 511 (internal quotation omitted). Here, the state trial court inferred bad faith on the part of interviewer Holzrichter and Detective Harris. With respect to Holzrichter, it held that she must have recognized the exculpatory nature of the list because of the manner in which she "hurried to change the subject, leave the room and stop the taping" after M.R.W. explained the first item on her list. That

court found it significant that "Holzrichter, acting as an agent of the State, cut off the interview before M.R.W. could describe more than one of her corrections," and that "[t]hrough her evasive postconviction testimony, Holzrichter conveniently claimed no memory of anything on the list or anything she did with the list." The state trial court found that these "obvious attempts to conceal M.R.W.'s written corrections constitute[d] bad faith."

As for Detective Harris, the state trial court reasoned that she knew "that M.R.W. was allowed to divulge only one of her multiple corrections," but said erroneously in her police report about the second interview that M.R.W.'s account was "true with one correction." To the state trial court, it was "simply unbelievable" that "Detective Harris' police report coincidentally erred in describing the coincidentally unpreserved evidence." The state trial court found that Detective Harris' police report also demonstrated bad faith on her part.

The state appellate court reversed both findings of bad faith as clearly erroneous. App. 112–13. In holding that the trial court's contrary conclusions lacked any basis in the record, the state appellate court reasoned from two grounds: first, its de novo review of the second video interview showing Holzrichter's behavior after M.R.W. offered the list, and second, its assessment that the trial court had not actually made a finding as to Detective Harris' bad faith. We consider these in turn.

As for Holzrichter, the Wisconsin Court of Appeals reviewed the second video interview de novo, concluding "that the exculpatory nature of the list was not apparent to the interviewer." App. at 113. Because "bad faith" requires "an official's subjective knowledge that the evidence had

exculpatory value," this conclusion effectively reversed the state trial court's factual finding that Holzrichter acted in bad faith as clearly erroneous. See *Bender*, 95 F.4th at 511, quoting *United States v. Holly*, 940 F.3d 995, 1001–02 (7th Cir. 2019). The state appellate court based this conclusion on parts of the video showing that, "as the interview drew to a close, the interviewer gave M.R.W. several opportunities to ask the interviewer questions and to relate what was on her list, and the interviewer continued to be patient with M.R.W. as she related her first correction." App. at 113. "[I]n response to the first correction that M.R.W. related, rather than rush M.R.W. out the door, the interviewer further spoke with M.R.W." *Id.* The state appellate court thus concluded that "[t]he video simply does not support a reasonable view that the interviewer hurried to change the subject." *Id.* The state trial court's "finding that the exculpatory nature of the list was 'apparent'" to Holzrichter had "no basis in the record." *Id.* at 112.

The presumption of correctness that federal habeas courts must give to state-court factual findings "applies not only to the state court's express factual findings, but also to the implicit resolution of a factual dispute that can be fairly inferred from the state court record." *Armstrong*, 34 F.3d at 426. Bad faith was a disputed factual issue in the state court record, so the Wisconsin Court of Appeals' review of Holzrichter's behavior in the second interview is entitled to this presumption of correctness. Because Holzrichter stated her intent at the end of the second interview to take a copy of the list so that Detective Harris could have it, too, it is at least as plausible to construe Holzrichter's behavior as innocent rather than as a "conscious effort to suppress exculpatory evidence." See *Bender*, 95 F.4th at 511, quoting *Holly*, 940 F.3d at 1001. The video is subject to different inferences and interpretations, and the

Wisconsin Court of Appeals' conclusions based on the video are not unreasonable. Nichols has not offered contrary evidence or argument sufficient to meet his burden of showing their clear error. The state appellate court's reversal of the state trial court's factual finding of Holzrichter's bad faith was not unreasonable as a finding of fact.

With respect to Detective Harris, the state appellate court reasoned that Nichols was wrong to assert that the state trial court had "inferred that the exculpatory nature of the list was apparent to Detective Harris." App. at 113. **"**Rather, the [state trial] court found incredible the detective's postconviction testimony as to her perception of the significance of the list and accorded it no weight." *Id.* We read the state trial court's opinion as finding expressly that "Detective Harris' erroneous police report misled the defense and demonstrates bad faith." *Id.* at 147. Regardless of these different readings of the state trial court's conclusion about the bad faith of Detective Harris, however, the appellate reversal of the state trial court's finding of bad faith was not unreasonable in light of the appellate court's broader finding that the list lacked any exculpatory value. Again, bad faith "turns on an official's subjective knowledge that the evidence had exculpatory value," so evidence that lacks any exculpatory value cannot be disposed of in bad faith. See *Bender*, 95 F.4th at 511, quoting *Holly*, 940 F.3d at 1001–02. We have already explained why the state appellate court's factual finding that M.R.W.'s list lacked any exculpatory value was not unreasonable in light of the consistency of M.R.W.'s testimony across the two video interviews and at trial. That reasoning extends to the state appellate court's reversal of the district court's factual finding that Detective Harris demonstrated bad faith. The appellate

court's finding was not unreasonable given its not-unreasonable conclusion that the list also lacked any exculpatory value.

E. *Ineffective Assistance*

Finally, we affirm the district court's finding that Nichols' claim for ineffective assistance of counsel was procedurally defaulted by his failing to raise the issue in his petition to the Wisconsin Supreme Court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (failure to present federal habeas claims to state supreme court results in procedural default of those claims); accord, *Moore v. Casperson*, 345 F.3d 474, 484–86 (7th Cir. 2003). Nichols argues on appeal that when the Wisconsin Supreme Court accepts review of a case, it brings all subsidiary issues with it. That may be true in a case where review is granted, but it does not avoid procedural default here. "Fair presentment requires a petitioner to put forward operative facts and controlling legal principles" at each level of state court review, *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004), which the petitioner must do by "fram[ing] the claim in terms so particular as to call to mind a specific constitutional right" and citing the relevant state and federal cases analyzing that right, *id.* (petitioner's reliance on *Strickland v. Washington*, 466 U.S. 668 (1984), made clear he was trying to assert ineffective assistance of counsel), quoting *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001). Even if we considered the substance of Nichols' ineffective assistance claim, it would fail because it is premised on a due process claim that fails on the merits for the reasons explained above.

In sum, the disappearance of the child-victim's list of corrections to her first statement was a troubling lapse in police and prosecution procedures. It should not have happened. But the trial jury had the opportunity to see both the first and

second interviews and to see the child testify. To the extent there were any conflicts between those three accounts from the child-victim, the jury could see them and the defense had the opportunity to raise them. Accordingly, we conclude that the Wisconsin Court of Appeals' decision was not contrary to or an unreasonable application of clearly established federal law, nor was it based on any unreasonable factual finding. The district court's judgment denying Nichols' section 2254 petition is

AFFIRMED.